MARRS et al. v. CITY OF OXFORD et al.

RAMSEY et al. v. SAME.

District Court, D. Kansas, Second Division.
February 27, 1928.

Nos. 477, 478.

1. **Courts ⬤═▷493(3)—Pendency of injunction suit in state court does not, prior to final judgment, bar similar action in federal court.**

Pendency of injunction suit in state court is not bar to similar action in federal court, until case has gone to final judgment, since such actions are in personam.

2. **Equity ⬤═▷46—Bill which shows absence of adequate legal remedy invokes equitable jurisdiction.**

Jurisdiction of court of equity is properly invoked, when it satisfactorily appears from bill that no adequate remedy exists at law.

3. **Injunction ⬤═▷85(2)—Equity may intervene by injunction to prevent enforcement of void ordinance, where accumulated penalties prescribed are unusually severe.**

Where the penalties of an ordinance are so severe that, as a practical proposition, party is not justified in running the risk of the accumulated penalties in order to test his constitutional right, equity may intervene and enjoin enforcement of the ordinance under claim of its unconstitutionality.

4. **Injunction ⬤═▷85(2)—Equitable jurisdiction may be invoked to enjoin enforcement of void ordinance which jeopardizes property rights.**

Where void municipal ordinance jeopardizes property rights, jurisdiction of court of equity may be invoked to enjoin enforcement thereof, in order to protect such property rights.

5. **Injunction ⬤═▷85(2)—Plaintiffs, operating oil well in violation of ordinance and liable to penalties up to $500 per day, held entitled to sue in equity to test constitutionality of ordinance.**

Suits to enjoin enforcement of ordinance regulating drilling of oil wells on city lots *held* within jurisdiction of equity, where plaintiffs were engaged in operating well contrary to ordinance, and were thus subject to aggregate fines of $500 per day, and under such circumstances plaintiffs were not required to wait for criminal prosecution under ordinance before testing out validity thereof.

6. **Injunction ⬤═▷123—No question of city's arbitrary refusal of permit to drill oil well was presented, where request for permit was not alleged.**

In suit by owners and lessee of town lots to enjoin enforcement of ordinance restricting drilling of oil wells, question of arbitrary refusal of city to grant permit was not presented, where bills did not allege that permit had been requested.

7. **Injunction ⬤═▷123—City's right to deny permit to drill oil wells on account of location held not involved in injunction suit, where denial of permit on such ground was not alleged.**

Question of city's right to deny permit to drill oil wells on city lots by virtue of ordinance giving power to refuse permit on account of improvements on property or suitability or adaptability of land for civic purposes *held* not involved in injunction suit testing constitutionality of ordinance, where it was not alleged that permit had been denied plaintiffs by reason of the location of the proposed well.

8. **Injunction ⬤═▷123—Injunction suit to test constitutionality of ordinance regulating drilling oil wells held not to involve question whether ordinance denied property owners right to recover oil under their property.**

Question whether city ordinance regulating drilling of oil wells on city lots denied property owners right to recover oil under their property was not presented in injunction suit by persons operating wells in violation of ordinance, when suit was brought to test constitutionality thereof, and not abuse of power thereunder.

9. **Equity ⬤═▷363—Court, on motion to dismiss bills, does not concede fact conclusions alleged which are opposed to common knowledge.**

On motion to dismiss bills in equity, facts well pleaded are considered to be true; but court is not required to concede conclusions of fact which are opposed to the common knowledge of mankind.

10. **Injunction ⬤═▷129(1)—Court may inquire into proper reasons for ordinance on motions to dismiss bills to restrain its enforcement.**

On motions to dismiss bills in equity to enjoin enforcement of ordinance, claimed to be void, court may inquire into proper reasons for the ordinance.

11. **Injunction ⬤═▷129(1)—Averments in bills that plaintiffs drilling oil well used all available safeguards against fire and injury to other property were admitted by motion to dismiss.**

Averments, in bills to restrain enforcement of ordinance regulating drilling of oil wells on town lots, that plaintiffs, in operating contrary to ordinance, employed all available safeguards against fire hazards, and exercised all proper care in guarding against injury to other property, were confessed by motion to dismiss, since facts were well pleaded.

12. Injunction ⊚⇒118(1), 129(1)—Allegations that drilling of oil well is not dangerous or detrimental to comfort of community held mere conclusions, not admitted by motions to dismiss bills.

General allegations in bills to restrain enforcement of city ordinance regulating drilling on town lots that drilling of an oil well is not unsafe, and is not detrimental to comfort of nearby residents, and is not dangerous, are mere conclusions of fact, which were not confessed by motion to dismiss.

13. Evidence ⊚⇒8, 14—It is common knowledge that slender derricks create danger in case of windstorm, and that production of oil and gas creates fire hazard, and that day and night drilling creates discomfort to neighbors.

It is common knowledge that a slender derrick is of danger to surrounding buildings in case of windstorm, that production of oil and gas creates fire hazard, and that day and night drilling causes discomfort to neighbors in vicinity.

14. Mines and minerals ⊚⇒47, 48—Oil and gas are not "property," but landowner has right of appropriation, having due regard to rights of other owners.

Oil and gas are not "property," in the sense that minerals in place are property; but, in view of their migratory and fugacious nature, landowner has right of appropriation, having due regard to rights of other owners in same pool.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property.]

15. Mines and minerals ⊚⇒86—Right of landowner to enjoy oil and gas on his property is subject to police power.

Even if oil and gas is considered as property in strict sense, right of landowner to enjoy oil and gas on his property is subject to police power.

16. Constitutional law ⊚⇒81—"Police power" extends to acts promoting public convenience or prosperity.

"Police power" is not limited to the protection of the health, peace, and morals of the community, but extends to acts which develop resources, and contribute to wealth, and promote public convenience or general prosperity.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Police Power.]

17. Constitutional law ⊚⇒81—One must so use his property that another will not be injured.

Law is well settled that owner of property has duty to so use it that it will not injure another.

18. Mines and minerals ⊚⇒86—Ordinances protecting public from waste of town lot drilling and preventing one owner from draining oil under his neighbors' lots are within police power.

Ordinances regulating drilling of oil wells in town lots, which afford protection to public generally from the waste of town lot drilling,

and assure owners of real estate that oil under their property may be economically recovered, and which prevent one owner from draining oil from his neighbor's property, are valid and within police power.

19. Courts ⊚⇒359—Quality of landowner's interest in oil and gas resources is determinable under state laws.

Quality of interest which landowner has in oil underneath his property is determined by laws of state where property is located.

20. Mines and minerals ⊚⇒47—Interest of property owner in subsurface oil constitutes "profit à prendre," under Kansas law.

Under law of Kansas, interest of owner in oil resources underneath his property constitutes a profit à prendre.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Profit à Prendre.]

21. Mines and minerals ⊚⇒47—In absence of regulation, surface owner under Kansas law may reduce to possession all underlying oil, without violating rights of other surface owners.

Under law of Kansas, owner of surface may prosecute his drilling for oil and gas, and may reduce to possession all or every part of oil deposit underneath the surface, without violating rights of other surface owners, unless drilling is regulated by law.

22. Mines and minerals ⊚⇒92—State has power to regulate drilling for oil and gas on town lots on account of common ownership of oil deposits and community problems involved.

In view of relation of number of wells in city to community's problems, and to possibility of unfair drilling of wells and appropriation of oil and gas deposits on account of common ownership of numerous surface owners, state has power to regulate drilling for oil and gas on town lots.

23. Mines and minerals ⊚⇒92—Ordinance requiring permit to drill oil and gas wells, and limiting wells held within authority of city of third class (Rev. St. Kan. 1923, 12—106, 15—401, 15—440).

Under Rev. St. Kan. 1923, 15—401, 15—440, 12—106, giving cities of third class power to pass ordinances for preservation of order and trade and health of inhabitants, and to grant permits for mining of oil and gas within city limits, ordinance enacted by city of third class, regulating drilling of oil and gas wells on town lots, requiring permits, and limiting drilling to one well on each block, *held* authorized.

24. Municipal corporations ⊚⇒594(1)—Ordinance, provisions of which are reasonable, will not be held invalid, because better provisions might have been inserted.

Where provisions of ordinance are in general reasonable, ordinance will not be held invalid because some better or more scientific provisions might be suggested by court or counsel.

**25. Mines and minerals ⬦⟶92—Ordinance requiring permits for drilling oil wells, limiting wells to one in each block, with option in lot owners of participating in profits or receiving royalties, held within police power.**

City ordinance requiring permit to drill oil and gas wells on city lots, and limiting permits to one well in each block, with provision for optional participation in profits by surface owners, or in the alternative for payment to them of royalties, *held* reasonable and valid, and within police power.

**26. Mines and minerals ⬦⟶92—Ordinance requiring permit for drilling oil wells, and allowing royalties to. surface owners "whose lands shall not be under lease," held not objectionable as denying royalty to lessors of oil property.**

Ordinance requiring delivery of royalty on oil well operated in city block "to the credit of each of such owners whose land shall not be under lease" *held* not objectionable, as denying royalty to owners who had since passage of ordinance leased property to one other than successful applicant for permit, since "lease" referred to means lease to one given permit.

**27. Mines and minerals ⬦⟶92—Ordinance allowing lot owners to participate with permittee drilling well or to receive royalties held not objectionable, as requiring partnership with driller.**

Ordinance requiring permit for operation of oil wells on town lots, limiting wells to one for each block, and permitting owners of lots to participate in expenses and profits, or to receive royalties, *held* not objectionable as requiring owners to enter into partnership contract with permittee drilling well.

**28. Injunction ⬦⟶126—It was presumed oil well drilling was commenced after enactment of ordinance requiring permits, where time of commencement was not alleged in suit to enjoin enforcement of ordinance.**

In suit to enjoin enforcement of ordinance requiring permit for drilling of oil. wells, it was presumed that drilling of well was commenced after enactment of ordinance, where bill failed to aver that it had been commenced prior thereto.

In Equity. Suits by C. A. Marrs and others and by C. L. Ramsey and another against the City of Oxford and others. On defendants' motions to dismiss complainants' bills. Bills dismissed.

Amidon, Hart, Porter & Hook, of Wichita, Kan., for plaintiffs Marrs and others.

John J. Jones, of Chanute, Kan., and B. R. Leydig and K. M. Geddes, both of El Dorado, Kan., for plaintiffs Ramsey and others.

Noble, Ayres, McCorkle & Fair, of Wichita, Kan., for defendants.

McDERMOTT, District Judge. These are bills in equity to enjoin the enforcement of a certain ordinance of the city of Oxford, Kan., and to adjudge and decree that said ordinance is unconstitutional and void. The ordinance was passed on June 20, 1927, and was published and effective on June 23, 1927. The bill in the Marrs Case was filed on September 8, 1927, and in the Ramsey Case on September 9, 1927. The plaintiffs in the Marrs Case allege that they are and have been for many years owners in fee simple of two lots in the city of Oxford, a tract of land 50 by 140 feet; that on June 29, 1927, they executed a lease on said property for the purpose of mining and operating such real estate for oil and gas. The plaintiffs in the Ramsey Case allege that they are owners of a tract of land in the city of Oxford, 20 feet by 170 feet, on which they have themselves drilled and completed a producing oil well at an expense of more than $20,000. The bill does not disclose whether such oil well was commenced before or after the passage of the ordinance whose validity is questioned. If such well was commenced, and a substantial expenditure made, prior to the passage of the ordinance, the plaintiffs as to this particular tract would stand in a different stead. The plaintiffs further allege that they are owners of block 24 in the city of Oxford, upon which they executed, on the 12th day of August, 1927, an oil and gas lease giving to the lessee the right to use said premises for the purpose of mining, operating for, and producing oil and gas.

The bills allege that the city of Oxford is a third-class city; that underlying the city is a valuable oil pool; that the value of the oil rights of the two 25-foot lots is approximately $100,000; that the oil in such pool is of a migratory character, and that one producing well will extract the oil within a distance of 400 or 500 feet from such well; that there were at the time of the filing of the bill more than 30 wells, either producing or drilling in the city of Oxford, or its immediate vicinity; that some of the wells producing or drilling would draw the oil from the premises of the plaintiffs, unless the enforcement of said ordinance was enjoined; that practically all of the blocks in the city are approximately 300 feet square; that the depth of the oil sand is from 2,000 to 2,100 feet; and that the cost of a single well is in excess of $20,000. In the Ramsey case it is alleged that other wells surround block 24, which will draw the oil from that block, unless a well is drilled upon such block. It is not alleged that any of the plaintiffs asked for a permit to drill as provided by the ordinance hereafter referred to.

It is alleged that the Roxana Petroleum Company, prior to the passage of the ordinance, procured an oil and gas lease executed by many persons who owned various lots and tracts in the city of Oxford, such lease providing that, regardless of the location of any well or wells that might be drilled upon any of the property covered by the community lease, each landowner should participate in all royalty payments in proportion to the acreage owned by him. It is alleged that the Roxana Petroleum Company, and its officers and agents, proposed the plan as set forth in Ordinance 512, and induced the officials of the city of Oxford to pass such ordinance. The bills allege that the drilling rigs in use are from 75 to 80 feet in height. It is also alleged that in the drilling of said wells, the plaintiffs are using and propose to use every available means to safe-guard against the hazard of fire and the care and disposition of refuse matter, and that the oil produced in such wells is transported beyond the city limits.

The ordinance in question, summarized, provides:

(1) That it shall be unlawful for any person to drill for oil or gas in certain described parts of the city without securing a permit from the city authorities.

(2) Within such territory, there shall only be one permit issued for one well in each block, unless more than one producing sand is found, in which case a permit may be granted for one well to each of the sands.

(3) Section 3 is as follows: "That in case a permit for the drilling of a well be issued to a person, persons, or corporation not holding oil and gas leases or drilling contracts with the owners of all the lots in the block, it shall be a condition of the permit that the permittee, its successors and assigns, shall deliver to the credit of each of such owners whose land shall not be under lease, free of cost, in the pipe line to which the well may be connected, a share of all oil produced and saved from such well, equal to one-eighth of the proportion of the whole production that the square feet of ground so owned bears to the square feet contained in such block, exclusive of the streets and alleys, and a like proportion of the proceeds of gas and casing head gas produced from the well and used off the premises."

(4) The drilling of any well within 150 feet of any street or railway track is prohibited.

(5) In case two parties apply for a permit to drill in a single block, both of whom are qualified, the permit shall go to that person who holds leases covering the greater area in the block; in case a permit is issued to persons who do not hold a lease or drilling contract from the owners of all of the land within the block, the owner of any unleased land and any person holding an oil and gas lease in such block shall have the right to share in the ownership and benefits of such oil or gas well in the proportion that the area of his land bears to the area in the block, by filing with the city clerk his election in writing to pay to the holders of the permit a proportion (based on land owned) of the total cost and expense of completing and operating said well, such election to be accompanied by a surety company bond guaranteeing the payment of his proportion of the cost of the operation of the well, in which case the landowner is entitled to his proportionate share of all the oil produced.

(6) No person shall drill in any street or alley of the city, or block or incumber any street or alley, without special permit from the city council.

(7) Procedural steps leading up to the permit are provided; the applicant shall provide copies of his leases and abstracts of title of the realty covered, pay an application fee of $100, and furnish a bond that the well will be promptly commenced and diligently prosecuted, and damage paid to the city or residents occasioned by the work. Power is reserved to refuse any application for a permit where, by reason of the location of the proposed well and the character and value of the permanent improvements already erected, on the block in question, or adjacent thereto, and the use to which the land and surroundings are adapted for civic purposes, or for sanitary reasons the drilling of a well would be a serious disadvantage to the city or its inhabitants as a whole.

(8) Provision is made for inclosing drilling rigs and equipping the same with fire extinguishers, where the rig is within 300 feet of a building. Storage of oil, except in a limited amount, is prohibited within the prescribed area.

(9) A permit shall terminate unless within 30 days of the date of the issue actual drilling operations shall commence, and the cessation of drilling operations for 30 days shall terminate it permanently.

(10) The permit shall not be construed as granting a right to occupy any property for the purpose of drilling, unless with the written consent of the owner of the land; the ordinance shall not limit or prevent any lot owner from contracting for any amount of royalty to be paid with reference to his

own land, or for damages, rights, or privileges with respect thereto.

(11) All oil, gas, and water produced in the drilling operations shall be conveyed beyond the boundaries of the area described in section 1, excepting for temporary slush ponds.

(12) No permit shall extend for a period longer than 20 years.

(13) The violation of any of the terms of the ordinance, "whether herein denominated as unlawful or not," is made a misdemeanor, and upon conviction a fine is imposed, not exceeding $100. Each day of the continuance of any such violation shall be considered a separate offense, and be punishable separately, and any person, agent, or employee engaged in any such violation shall on conviction be so punished therefor.

The bills allege that the plaintiffs proceeded in disregard of such ordinance and that they and their employees were arrested and subjected to fines, and that, because of the provision that each day's violation was a separate offense, their remedy at law is inadequate, and that the only practical way of testing the validity of the ordinance is by the aid of a court of equity.

The bills further allege that the drilling of said wells does not and will not occasion any injury, damage, or inconvenience to any person or property, and that the plaintiffs are exercising all proper care in guarding against injury, damage, or expense to other property in the vicinity. It is alleged that the drilling of such wells is not detrimental to the health of the inhabitants of the city of Oxford, is not detrimental to the comfort of the inhabitants in the vicinity of said wells, and that such drilling is a lawful occupation and is not a nuisance.

The bills allege that the ordinance is void for uncertainty; because it creates an unlawful monopoly in favor of the Roxana Petroleum Company, and is discriminatory against the owners of all oil rights in the city of Oxford; that it denies to the plaintiffs the rights, privileges, and immunities granted under the Fourteenth Amendment to the Constitution; that it is not a valid exercise of police power; that no hearing is provided for; and the validity of each and every section of the said ordinance is challenged under the Fourteenth Amendment to the Constitution.

The bills pray for a decree declaring the ordinance to be null and void, and for an injunction against the enforcement thereof.

A temporary restraining order has been issued, which has been continued in effect by stipulation of the parties pending the hearing of these motions to dismiss. A motion to dismiss each of the bills has been filed, which motions test the sufficiency of the bills, and further allege that another suit is pending in a state court, the object of which is to test the same ordinance. These motions have been briefed and submitted, and now come on for decision.

[1] Before coming to the merits of the controversy, it may be well to dispose of some of the incidental matters. The pendency of the proceeding in the state court does not appear from the bills of complaint; moreover, the actions being in personam, the pendency of an action in the state court is not a bar to a similar action in this court, until the case has gone to final judgment. Kline v. Burke Construction Co., 260 U. S. 226, 43 S. Ct. 79, 67 L. Ed. 226, 24 A. L. R. 1077.

[2-5] The jurisdiction of this court is properly invoked, where it satisfactorily appears from the bills that no adequate remedy exists at law. From the allegations of the bills it appears that the plaintiffs in each case must run the risk of fines which might aggregate as much as $500 a day, in order to test the validity of the ordinance in the ordinary course of proceedings at law. Where the penalties of an ordinance are so severe that, as a practical proposititon, a party is not justified in running the risk of the accumulated penalties in order to test his constitutional right, equity may intervene and enjoin the enforcement of the ordinance. The law is well settled. Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Dobbins v. Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. Ed. 169; City of Hutchinson v. Beckham, 118 F. 399 (8 C. C. A.). Moreover, property rights are jeopardized by the case presented here, and in order to protect such property rights the jurisdiction of a court of equity may be invoked. Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570.

[6-8] It may also be well to eliminate several questions that are urged, which are not now presented for determination. The plaintiffs argue the question of an arbitrary refusal of the city authorities to grant a permit, and the question of a landowner being denied the right to recover any oil under that provision of the ordinance which reserves to the city authorities the power to refuse to issue a permit, because of the location of the proposed well with relation to valuable permanent improvements or to land

adapted for civic purposes. The bills do not allege that the plaintiffs have asked for a permit, and consequently there can be no question of an arbitrary refusal presented. Neither is it alleged that the permit has been denied by reason of the location of the proposed well, and that question will be reserved until it is presented for determination.

The plaintiffs also argue the question of landowners being denied the right to recover any oil under their property, a question also not presented in this case. The question presented is one of the power of the city authorities to pass the ordinance in question, and not the abuse of power under the ordinance.

The question presented may be divided into three parts:

(1) Has the state any right to regulate the drilling of oil wells in the manner attempted by the ordinance in question?

(2) Has the state delegated that power to cities of the third class?

(3) If the power exists, does this ordinance offend in the method of its exercise?

[9-13] In considering these motions, facts well pleaded are conceded to be true. This does not require a court to concede conclusions of fact which are opposed to the common knowledge of mankind, nor foreclose the court from inquiring into the proper reasons for the ordinance. The averment in the bills that the plaintiffs are employing all available means necessary to safeguard others against the hazards of fire, and are exercising all proper care in guarding against injury or damage to other property in that vicinity, are well-pleaded facts, which are confessed by the motion. General allegations that the drilling of an oil well is not unsafe, and is not detrimental to the comfort of the inhabitants of the community or vicinity, and is not attended with danger, are conclusions of fact, which are not confessed by the motion.

Common knowledge teaches that a slender derrick, 75 to 80 feet in height, is of some danger to surrounding buildings in case of a windstorm; there is a fire hazard connected with the production of oil and gas in immediate proximity to boilers, a hazard which is reflected by the public records of this state, which disclose heavy additional fire insurance rates on any structure within 50 feet of a drilling oil well; there is a discomfort to neighbors in the necessary noise attendant upon day and night drilling; allegations to the contrary are but conclusions, and may be disregarded.

The city authorities of Oxford confront-ed the problem of "town lot drilling," a problem which has confronted many cities, and many oil companies, particularly in the last few years. That this is a problem cannot well be denied. Oil and gas, different from ordinary minerals, is fugacious. In a sense it belongs to the first to appropriate it. In the case at bar, the sand is such that one well will draw the oil from a pool from 800 to 1,000 feet in diameter. Fluids seek their own level. Every stroke of the pump on the town lot of Jones takes oil from under the land of Jones and that of every neighbor within a radius of 500 feet. The neighbors confront the situation of standing by and watching Jones become rich from oil that comes from under their lots, or drilling a well themselves. And so the mad race is on. Rather than get nothing, a lot owner will give up half or three-quarters of his usual royalty. Where one well, costing $20,000 will lift all the oil there is, the drilling of 100 wells is an economic waste, reflected in the price of oil, and borne in part by the owner of the land, either in reduced royalty, a lessened bonus, or in the price he gets for his oil.

A dozen drilling rigs in a city block more than multiplies the danger from fire and wind, and the necessary inconveniences and discomforts to the residents; it exactly multiplies the wear and tear on city streets, always abused by the necessary hauling of rig timbers, bull wheels, and casing. Moreover, it is practically impossible for each landowner to get his proper share of the oil or gas. If every lot owner leased on the same day, and every well was spudded in at the same instant, the sand would not be reached the same day. The frailty of men and machinery results in lost tools, parted casings, crooked holes, disabled power; the result is that some fortunate owner gets the flush production from his own and all his neighbors' land. Moreover, there is always a chance that oil companies will some time decline to drill on isolated lots, or in incomplete blocks; and this would enable one owner to squeeze the owner of an isolated lot from any participation in his own oil, or enable a stubborn owner to prevent any drilling in the block. Town lot drilling is a menace to the community, and an economic waste to the landowner, the oil operator, and the public.

That there is a problem is attested by the fact that many states and municipalities have grappled with it. The Secretary of the Interior presented the public problem to the

American Bar Association at its 1927 session, in the following language:

"When once man has started things, this property is mobile, so that the contest cannot be a leisurely procedure in the courts, but of necessity becomes a strenuous fight on the ground, with drilling rigs and crews racing to reach the oil first and to reduce to actual possession the elusive and fugitive property. The ordinary workings of the economic law of supply and demand find no chance in the business of producing petroleum. The decision to drill does not wait on market reports; demand for the product is rarely a factor in influencing the development of oil property—simply the desire to get the oil before some one else gets it. Thus, as in no other activity, the oil industry throws financial conservatism and business sagacity to the winds, and indulges in the primitive instincts of the chase. Now, at last, the thinking leaders of this great business realize the need of restraint—preferably from within, self-regulation, but at all events some restraining hand." 32 Am. Bar Ass'n Reports, p. 570.

The plaintiffs stand firm on their constitutional rights. The oil is their property, they contend, and no power exists to deprive or limit their right to appropriate it and enjoy it. It is earnestly and vigorously insisted that the ordinance deprives them of their property without due process of law, and deprives them of their constitutional right to make such contracts concerning the recovery of it as their judgment dictates. It will be observed that the two actions present a case from the standpoint of three separate interests: The plaintiff in the Marrs Case stands as a landowner who has made a lease to a third party; in the Ramsey Case, as to one part of the real estate, the plaintiffs stand as owners who desire to drill their own well, and as to the other tract one of the plaintiffs stands as a lessee. We have here the case presented from the standpoint of a lessor, the lessee, and the owner who desires to drill his own well.

[14, 15] Two answers suggest themselves to the argument of plaintiffs: Oil and gas, because of its migratory and fugacious nature, is not property in the sense that minerals in place are property; the right of the owner, under the law generally, and particularly under the Kansas law, is the right of appropriation, having due regard to the rights of other owners in the same pool. Second, even if oil and gas is considered as property in the strictest sense of the word,

the right of an owner to enjoy it is still subject to the police power.

[16, 17] Taking up the latter proposition first: Without any attempt to define police power, it is sufficient to say that the police power is not limited to the protection of the health, peace, and morals of the community. It has been said to extend to acts that "increase the industries of the state, develop its resources, and add to its wealth and prosperity" (Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923), and to "promote the public convenience or the general prosperity" (C., B. & Q. Ry. v. People, 200 U. S. 561, 26 S. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175). It has been the law from time immemorial that it is the duty of the owner of property to so use it that it will not injure another. Legislation which reasonably enforces that common-law obligation upon owners of property has always been held constitutional. It is only necessary to refer to the large number of cases involving city zoning. Zoning ordinances of a great variety of characteristics have been sustained very generally by the state courts, and their constitutional aspects have reached the Supreme Court of the United States in Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, and the ordinance in that case was held to be valid.

The unsuccessful plaintiffs in the latter case made the same general attack upon the zoning ordinance of the village of Euclid as the plaintiffs make here. The ordinance in that case placed serious limitations upon the use to which owners might put their real estate in the village of Euclid. An owner desiring to build an apartment house was denied the privilege by the ordinance; other owners were denied the privilege of constructing other proper and lawful business establishments, both mercantile and industrial, on their property. Still other owners were forbidden to construct buildings of more than a certain height, or nearer to the street than the prescribed distance. The power in the city authorities of the village of Euclid to so limit the rights of the owners of property was upheld by the Supreme Court. The court in that case said in substance that, if reasonable grounds existed, the ordinance was valid. The court said that the city authorities might have considered that the use of real estate for apartments or shops in a residence district would increase the necessity for fire protection, for police protection, and cause an exceptionally heavy use of the streets for traffic. The ordinance was sustained on the broad ground that one can

be compelled by law to so use his own as not to injure another. Mr. Justice Sutherland said:

"The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. In solving doubts, the maxim 'Sic utere tuo ut alienum non lædas,' which lies at the foundation of so much of the common law of nuisances, ordinarily will furnish a fairly helpful clew. And the law of nuisances, likewise, may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies in the process of ascertaining the scope of, the power. Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality. Sturgis v. Bridgeman, L. R. 11 Ch. 852, 865. A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. Radice v. New York, 264 U. S. 292, 294." [44 S. Ct. 325, 68 L. Ed. 690].

[18] It is probably true that every reason advanced by the Supreme Court of the United States for sustaining the zoning ordinance in the village of Euclid applies with like or greater force in support of the ordinance of the village of Oxford. The argument most generally used in support of zoning ordinances is that of the stabilization of property values. It is generally conceded that the value of property in a residence district may be greatly impaired by the erection on a certain lot of a factory, a retail store, or an apartment house. The stabilizing of property values, and giving some assurance to the public that, if property is purchased in a residential district, its value as such will be preserved, is probably the most cogent reason back of zoning ordinances. That reason exists in the case at bar. An ordinance which affords some protection to the public generally from the waste of town lot drilling, and gives some assurance to owners of real estate that the oil under their property may be economically recovered, is within the police power. An ordinance that makes it impossible for a diligent or fortunate lot owner to drain the oil from his neighbor's lots, to his own exclusive use; an ordinance which makes it impossible for an owner of property in a block to prevent any recovery of oil on other parts of the block—is valid.

The power to impose some regulation is scarcely deniable, under the narrowest definition of the police power. Doubtless the officials of the city of Oxford had watched "oil towns" come and go. They had witnessed the coming in of the discovery well; the fever of initial excitement; the wild scramble for leases; the hurried erection of derricks; the day and night drilling; the influx of people of every sort, not only the men of money and science, the developers of the industry, but the camp followers, the speculators, the gamblers, and others who follow crowds. They had seen the field soon drained, and after a while little left but the litter of the battle field. Oxford has been a small trading center, with its banks and schools and churches, for many years. It will continue to be such for many years after the oil is gone. If its city authorities wanted the oil recovered in an orderly way, with one well to the block, so that the operations could be carried on within control of its police and fire protection facilities, with as little inconvenience to its citizens as possible, and so that there would be a minimum of scars left when the pool was drained, its power to take some steps toward that end can scarcely be denied.

[19, 20] But oil and gas is not corporeal property, in which the owner of the surface has the same title as he does to minerals in place. The reason for the distinction is because it is a physical impossibility for one lot owner to take the oil from under his lot and no more. The quality of the interest which the owner has in the oil underneath his property is, of course, determined by the laws of Kansas. That state, in common with the decisions of other states generally (except Texas), has held that oil is an incorporeal hereditament. It is defined by the Kansas court as a profit à prendre. In the early case of Phillips v. Oil Co., 76 Kan. 783, 92 P. 1119, the court said:

"An oil and gas lease conveys no present vested interest in the oil and gas in place. The interest conveyed is a mere license to explore—an incorporeal hereditament—a

profit à prendre. * * * The discovery of oil or gas under the lease authorizes the lessee to sever the mineral from the soil, and after he has done this, and not before, he acquires the ownership of the thing severed."

This decision has been repeatedly followed, and the decisions were reviewed and the law restated in National Supply Co. v. McLeod, 116 Kan. 477, 227 P. 350. This law of property is the same as the Indiana law concerning oil and gas. Townsend v. State, 147 Ind. 624, 47 N. E. 19, 37 L. R. A. 294, 62 Am. St. Rep. 477.

In the case of Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729, a statute of Indiana was challenged on substantially the same constitutional grounds as are urged here. That statute prohibited the owner from permitting waste of gas or oil from wells drilled on his own property. It was strenuously contended that since the oil and gas was the property of the owner, he had a right to waste it if he cared to do so. The Supreme Court of Indiana held that the law was constitutional, and its decision was affirmed by the Supreme Court of the United States. In a unanimous opinion, written by Mr. Justice White, the court said:

"Thus it is apparent, from the admitted facts, that the oil and gas are commingled and contained in a natural reservoir which lies beneath an extensive area of country, and that as thus situated the gas and oil are capable of flowing from place to place, and are hence susceptible of being drawn off by wells from any point, provided they penetrate into the reservoir. It is also undoubted that such wells, when bored from many points in the superincumbent surface of the earth, are apt to reach the reservoir beneath. From this it must necessarily come to pass that the entire volume of gas and oil is in some measure liable to be decreased by the act of any one who, within the superficial area, bores wells from the surface and strikes the reservoir containing the oil and gas. And hence, of course, it is certain, if there can be no authority exerted by law to prevent the waste of the entire supply of gas and oil, or either, that the power which exists in every one who has the right to bore from the surface and tap the reservoir involves, in its ultimate conception, the unrestrained license to waste the entire contents of the reservoir by allowing the gas to be drawn off and to be dispersed in the atmospheric air, and by permitting the oil to flow without use or benefit to any one. These things being lawful, as they must be if the acts stated, cannot be controlled by law, it follows that no particular individual having a right to make borings can complain, and thus the entire product of oil and gas can be destroyed by any one of the surface owners. * * * Does the peculiar character of the substances, oil and gas, which are here involved, the manner in which they are held in their natural reservoirs, the method by which and the time when they may be reduced to actual possession or become the property of a particular person, cause them to be exceptions to the general principles applicable to other mineral deposits, and hence subject them to different rules? True it is that oil and gas, like other minerals, are situated beneath the surface of the earth, but except for this one point of similarity, in many other respects they greatly differ. They have no fixed situs under a particular portion of the earth's surface within the area where they obtain. They have the power, as it were, of self-transmission. No one owner of the surface of the earth, within the area beneath which the gas and oil move, can exercise his right to extract from the common reservoir, in which the supply is held, without, to an extent, diminishing the source of supply as to which all other owners of the surface must exercise their rights. The waste by one owner, caused by a reckless enjoyment of his right of striking the reservoir, at once, therefore, operates upon the other surface owners."

[21] The court then stated that the Indiana decisions governed as to the nature of property in the oil and gas. The court further said that, in the absence of regulation by law, every owner of the surface may prosecute his drilling and may reduce to possession all or every part of the oil deposit underneath the surface without violating the rights of other surface owners. This also is the law of Kansas. The court then distinguished oil and gas from animals feræ naturæ, and stated, while the public could be excluded from any appropriation of animals feræ naturæ, such general prohibition could not be had as to oil and gas. The court said:

"They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply, the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to

actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or by waste by one or more, to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment by them, of their privilege to reduce to possession, and to reach the like end by preventing waste. * * * Viewed, then, as a statute to protect or to prevent the waste of the common property of the surface owners, the law of the state of Indiana which is here attacked because it is asserted that it devested private property without due compensation, in substance, is, a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others.

"Indeed, the entire argument, upon which the attack on the statute must depend, involves a dilemma, which is this: If the right of the collective owners of the surface to take from the common fund, and thus reduce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If, on the other hand, there be, as a consequence of the right of the surface owners to reduce to possession, a right of property in them, in and to the substances contained in the common reservoir of supply, then as a necessary result of the right of property, its indivisible quality and the peculiar position of the things to which it relates, there must arise the legislative power to protect the right of property from destruction. To illustrate by another form of statement, the argument is this: There is property in the surface owners in the gas and oil held in the natural reservoir. Their right to take cannot be regulated without devesting them of their property without adequate compensation, in violation of the Fourteenth Amendment, and this, although it be that if regulation cannot be exerted one property owner may deprive all the others of their rights, since his act in so doing will be damnum absque injuria. This is but to say that one common owner may devest all the others of their rights without wrongdoing, but the lawmaking power cannot protect all the owners in their enjoyment without violating the Constitution of the United States."

This decision has been widely quoted and twice cited by the Supreme Court of the United States as direct authority to support the power of the state to regulate the appropriation of oil and gas from a common pool.

In Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160, a statute of New York was challenged which prohibited any pumping from a certain type of wells that produced a gas-charged mineral water. The statute was predicated upon the proposition that, as to such fluids underneath the earth's surface, "there is a coequal right in all the surface owners to draw upon it." The Supreme Court sustained the statute and said:

"It is to prevent or avoid the injury and waste suggested that the statute was adopted. * * * Thus these pumping operations generally result in an unreasonable and wasteful depletion of the common supply and in a corresponding injury to others equally entitled to resort to it. It is to correct this evil that the statute was adopted, and the remedy which it applies is an enforced discontinuance of the excessive and wasteful features of the pumping. It does not take from any surface owner the right to tap the underlying rock and to draw from the common supply, but, consistently with the continued existence of that right, so regulates its exercise as reasonably to conserve the interests of all who possess it. That the State, consistently with due process of law, may do this is a necessary conclusion from the decision in the case cited. But were the question an open one we still should solve it in the same way."

In Walls v. Midland Carbon Co., 254 U. S. 300, 41 S. Ct. 118, 65 L. Ed. 276, a statute of Wyoming prohibited the extraction of any natural gas, by a surface owner, unless it was so used, after recovery, that all its heat units were utilized. Its application was confined to a 10-mile limit from any city or industrial plant. The statute seriously damaged the plant of the plaintiff, which had cost $375,000, and property of a pipe line company of a value of $95,000. This property had to be either abandoned or moved. The purpose of the statute was declared to be for "the protection and conservation of the supply of natural gas." The law was held to be a valid exercise of the police power. The court referred to Bacon v. Walker, 204 U. S. 311, 27 S. Ct. 289, 51 L. Ed. 499, and a statute there involved which regulated the use by individuals of the public domain. The court then said:

"We there said in substance that, the power of regulation existing, the imposition of some limit to a right, when its exercise would impinge upon the equal right of another, was the exercise of legislative power, and that the circumstances which induced it could not be pronounced illegal 'on surmise or on the barren letter of the statute.' And we said, further, that where equal rights existed the state has an interest in their accommodation. * * * The case, and those it cites, are authority for the position that a state may consider the relation of rights and accommodate their coexistence, and, in the interest of the community, limit one that others may be enjoyed."

The court further said: "The determining consideration is the power of the state over, and its regulation of, a property in which others besides the companies may have rights, and in which the state has an interest to adjust and preserve; natural gas being one of the resources of the state. And in this consideration it is more important to consider, not for what a particular owner uses the gas, but the proportion of his use to that of others, or, it may be, the prevention of use by others."

[22] These decisions leave not the slightest doubt that the state has the power to regulate the appropriation of oil or gas from a common pool, on the ground of common ownership. The right to regulate the number of wells drilled in a given area has also been sustained in the case of Oxford Oil Co. v. Atlantic Oil & Producing Co. (D. C. Tex.) 16 F.(2d) 639. In this case the statute of Texas was sustained which vested with the Railroad Commission of that state the power to "establish rules and regulations for the drilling of wells and preserving a record thereof, and it shall be its duty to require such wells to be drilled in such manner as to prevent injury to the adjoining property, and to prevent oil and gas and water from escaping from the stratas in which they are found into other stratas, and to establish rules and regulations therefor." (Laws 1919, Tex., c. 155, art. 3.)

Legislation looking to the protection and conservation of oil and gas, because of its value as an asset of the state, has been common in the oil states for half a century. While all of it has not been tested in the courts, none of it, except the Oklahoma and Indiana statutes forbidding transportation out of the state, has been held invalid as far as I am advised. Among such statutes are: Acts Pa., 1878 (P. L. p. 56; Pa. St. 1920, §§ 16256–16258), requiring the capping of abandoned wells; chapter 217, Laws N. Y., 1879, to the same effect; West Virginia, Laws 1891, p. 317, requiring casing off of water; Indiana, Laws 1889, p. 369, to the same effect and prohibiting generally waste of gas by any means; Oklahoma, Laws 1913, p. 171, prohibiting an owner from taking more than 25 per cent. of the daily open flow of a gas well; Louisiana, Acts 1924, p. 655, to the same effect; Arkansas, Laws 1921, p. 216, to the same effect.

Several states have given commissions power to regulate the drilling of wells, and the production therefrom. By reference, the rules and regulations of the Bureau of Mines or the Secretary of the Interior, adopted for wells on government land, are adopted. New Mexico, Laws 1925, c. 121; Wyoming, Laws 1921, c. 157; Montana, Laws 1925, c. 56.

These are but illustrative of the proposition that the states have long exercised their right to conserve this asset. The Oxford ordinance may not be a conservation ordinance, for it does not appear that the drilling of an excessive number of wells depletes the total supply recovered. A question perhaps more economic than legal is presented of whether a state might treat the net value of its oil—that is, its value less the cost of recovery—as the asset to be conserved, as well as the physical oil, or whether, since excessive drilling produces so-called "distress" gasoline, which depreciates its value in dollars, the state might treat its value as an asset—questions unnecessary now to explore.

It seems clear that on two grounds at least—that the number of wells has a direct bearing on the public problems of a community, and that the state can regulate the appropriation of this peculiar mineral for the protection of that part of the public enjoying a common ownership thereof—the power of the state to regulate "town lot" drilling, is clear. If the power exists in the state to regulate town lot drilling, two questions yet remain: Has the state delegated that power to cities of the third class? and is the ordinance reasonably adapted to the needs?

[23] Section 15—401, R. S. Kan. 1923, grants cities of the third class the power to pass such ordinances as it shall deem expedient "for the good government of the city, the preservation of the peace and good order, the suppression of vice and immorality, the benefit of trade and commerce, and the health of the inhabitants thereof, and such other ordinances, rules and regulations as may be necessary to carry such power into effect"; and by section 15—440, R. S. Kan. 1923,

cities of the third class are empowered to pass ordinances "for the maintenance of the peace, good government and general welfare of the city, and its trade, commerce and manufactures." Section 12—106, R. S. Kan. 1923, grants to cities of the third class the right to "grant permits or make contracts with persons or corporations to mine coal, oil or gas within the limits of said city, under such restrictions as shall protect public and private property and insure proper remuneration for such grants: Provided, that no franchise, right of way or privilege of any character whatever shall be granted for a longer period than twenty years." The above statutes confer authority on the cities of the third class to pass such an ordinance as the one involved here.

[24, 25] There remains the question of whether this ordinance is reasonably adapted to the situation. Very generally speaking, the ordinance undertakes to provide that but one well shall be drilled in a city block in a certain part of the city; that that well shall be drilled by the lessee who holds leases for the larger amount of acreage within the block; that any lessee must agree to drill promptly, and as to the owners of property not under contract with the driller it gives the option of participation in the expense of the well and a proportionate share of all the oil lifted by the well; or, if the owner does not care to embark in the drilling business, it gives to the owner the usual royalty of one-eighth of all the oil or gas produced from under his property. Mutual bonds are required of the driller and the owner who exercises the option to participate in the drilling. If town lot drilling is to be regulated, counsel for plaintiffs have not advised the court of any fairer method of handling the situation. It is conceivable that it might have been provided that owners not participating in the lease should, in addition to their one-eighth royalty, have had a proportionate interest in any bonuses that might have been paid for other leases in the same block by the operator.

Granted, however, the reasonableness of the provisions in general, the ordinance is not invalid because some better or more scientific provision might be suggested by court or counsel. "A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160. The conclusion follows that the ordinance in its general provisions is reasonably adapted to the situation and is valid.

Specific complaint is made as to particular sections. Similar specific complaints were directed at the zoning ordinance in the case of Euclid v. Ambler Co., supra, and the Supreme Court of the United States refused to deal with them. The court dealt with the main question of whether the ordinance in its general aspect was constitutional and declined to go into the particular provisions and said:

"Under these circumstances, therefore, it is enough for us to determine, as we do, that the ordinance in its general scope and dominant features, so far as its provisions are here involved, is a valid exercise of authority, leaving other provisions to be dealt with as cases arise directly involving them."

Some of the particular complaints alleged in the instant case appear to grow out of a strained construction of the ordinance. It is urged that a landowner is ineligible to apply for a permit. Since the landowner plaintiff has not been denied a permit, the question does not arise; but it seems that this contention is predicated upon a forced construction of isolated phrases, which a reading of the entire ordinance does not justify.

[26] It is further argued that a landowner who has made a lease cannot receive any royalty, if his lessee is not the successful applicant for a permit. This is incorrect. This case, and this opinion, apply only to lessors or lessees under a lease made *after* the ordinance was effective. As to leases made *before* the ordinance, other questions, under the impairment clause of the Constitution, would arise, not considered here. As to leases made after the ordinance, the lessee knew that unless he procured a permit he could not perform his covenant to diligently develop, expressed in some leases and implied in all, and the essential consideration of the lease fails. This contention is predicated upon the obligation of the permittee, to "deliver to the credit of each of such owners whose land *shall not be under lease*" the prescribed royalty. Elemental rules of construction would read into this phrase its obvious meaning, to wit, "whose land shall not be under lease *to the permittee*," mentioned in the same sentence.

[27] Further complaint is made that the ordinance requires an owner to enter into a partnership contract with the driller. It does not require; it permits; and the relation resulting is not a partnership. It seems fair that a single lot owner should have the

option of participating in the gamble involved in drilling into an oil pool under his own ground. Counsel suggest no better method of giving him that option. It is also urged that the ordinance is indefinite, and does not make clear what acts are punishable. When some person is charged with violating an alleged obscure provision will be time enough to determine that. Provision as to application fee, bonds, and other details have been urged and considered; in my opinion, none of them is fatal.

[28] The bill is not clear whether the well drilled by the Ramseys on their own lots was commenced prior to the effective date of the ordinance. The bills are drawn with particularity and skill in other respects, and the presumption is indulged that such well was commenced after the ordinance. If substantial expenditures had been made on a well prior to the ordinance, it is doubtful whether section 1 of the ordinance applies; if construed as applicable, its constitutionality is a question not necessary now to determine. If this well in fact was commenced before the ordinance, that fact can be set out by appropriate amendment.

A decree will be drawn, dismissing both bills, with costs to the defendants; the restraining order will be discharged, and exceptions allowed; the decree may provide for a stay for such reasonable time as counsel may deem necessary for the perfection of appeal.

It is so ordered.