## CHAMPLIN REFINING CO. v. CORPORATION COMMISSION OF STATE OF OKLAHOMA et al.

### No. 1156.

District Court, W. D. Oklahoma.

Aug. 5, 1931.

Dissenting Opinion Aug. 11, 1931.

824

KENNAMER, District Judge, dissenting.

Harry O. Glasser and H. G. McKeever, both of Enid, Okl., and Geo. Ramsey and Edgar A. Demeules, both of Tulsa, Okl., for complainant.

J. H. Miley, of Oklahoma City, Okl., W. P. Z. German, of Tulsa, Okl., Jess L. Ballard, Asst. Atty. Gen., and E. S. Ratliff, Atty. for Oklahoma Corporation Commission, and Chas. West, for Governor of Oklahoma, both of Oklahoma City, Okl., for defendants.

Before COTTERAL and PHILLIPS, Circuit Judges, and KENNAMER, District Judge.

COTTERAL and PHILLIPS, Circuit Judges.

This is a suit brought by Champlin Refining Company, a corporation, to enjoin the

enforcement of certain oil proration orders made by the corporation commission of the state of Oklahoma. The case has been finally heard and submitted on the merits; the facts appear from the special findings of fact filed herewith and need not be reiterated here.

The orders in question are predicated on the provisions of the Act of February 11, 1915, S. L. 1915, page 35, sections 7954–7963, inclusive, C. O. S. 1921, which is set out in footnote.[1]

Counsel for plaintiff contend: First, that the statute on which the orders are predicated is unconstitutional; and, second, if the statute is valid that the orders themselves violate the constitutional rights of plaintiff and are void.

### The Validity of the Statute.

We observe at the outset that the burden rests upon the plaintiff to establish that

---

[1] "Section 1. Waste prohibited. That the production of crude oil or petroleum in the State of Oklahoma, in such manner and under such conditions as to constitute waste, is hereby prohibited.

"Section 2. Production and sale regulated—corporation commission. That the taking of crude oil or petroleum from any oil-bearing sand or sands in the State of Oklahoma at a time when there is not a market demand therefor at the well at a price equivalent to the actual value of such crude oil or petroleum is hereby prohibited, and the actual value of such crude oil or petroleum at any time shall be the average value as near as may be ascertained in the United States at retail of the by-products of such crude oil or petroleum when refined less the cost and a reasonable profit in the business of transporting, refining and marketing the same, and the Corporation Commission of this State is hereby invested (vested?) with the authority and power to investigate and determine from time to time the actual value of such crude oil or petroleum by the standard herein provided, and when so determined said Commission shall promulgate its findings by its orders duly made and recorded, and publish the same in some newspaper of general circulation in the State.

"Section 3. Waste defined—protection. That the term 'waste' as used herein, in addition to its ordinary meaning, shall include economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands. The Corporation Commission shall have authority to make rules and regulations for the prevention of such wastes, and for the protection of all fresh water strata, and oil and gas bearing strata, encountered in any well drilled for oil.

"Section 4. Production regulated—discrimination of purchaser prohibited. That whenever the full production from any common source of supply of crude oil or petroleum in this State can only be obtained under conditions constituting waste as herein defined, then any person, firm or corporation, having the right to drill into and produce oil from any such common source of supply, may take therefrom only such proportion of all crude oil and petroleum that may be produced therefrom, without waste, as the production of the well or wells of any such person, firm or corporation, bears to the total production of such common source of supply. The Corporation Commission is authorized to so regulate the taking of crude oil or petroleum from any or all such common sources of supply, within the State of Oklahoma, as to prevent the inequitable or unfair taking, from a common source of supply, of such crude oil or petroleum, by any person, firm, or corporation, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another.

"Section 5. Wells gauged—governor to consent. That for the purpose of determining such production, a gauge of each well shall be taken under rules and regulations to be prescribed by the Corporation Commission, and said Commission is authorized and directed to make and promulgate, by proper order, such other rules and regulations, and to employ or appoint such agents with the consent of the Governor, as may be necessary to enforce this act.

"Section 6. Enforcement of act—hearings before corporation commission. That any person, firm, or corporation, or the Attorney General on behalf of the State, may institute proceedings before the Corporation Commission, or apply for a hearing before said Commission, upon any question relating to the enforcement of this act, and jurisdiction is hereby conferred upon said Commission to hear and determine the same. Said Commission shall set a time and place, when and where such hearing shall be had and give reasonable notice thereof to all persons or classes interested therein, by publication in some newspaper or newspapers, having general circulation in the State, and in addition thereto, shall cause reasonable notice in writing to be served personally on any person, firm or corporation complained against. In the exercise and enforcement of such jurisdiction, said Commission is authorized to determine any question or fact, arising hereunder, and to summon witnesses, make ancillary orders, and use mesne and final process, including inspection and punishment as for contempt, analogous to proceedings under its control over public service corporations, as now provided by law.

"Section 7. Appeals to supreme court—effect on orders. That appellate jurisdiction is hereby conferred upon the Supreme Court in this State to review the action of said Commission in making any order, or orders, under this act. Such appeal may be taken by any person, firm or corporation, shown by the record to be interested therein, in the same manner and time as appeals are allowed by law from other orders of the Corporation Commission. Said orders so appealed from shall not be superseded by the mere fact of such appeal being taken, but shall be and remain in full force and effect until legally suspended or set aside by the Supreme Court.

"Section 8. Penalty for violation. That in addition to any penalty that may be imposed by the Corporation Commission for contempt, any person, firm, or corporation, or any officer, agent or employee thereof, directly or indirectly violating the provisions of this act, shall be guilty of a misdemeanor, and upon conviction thereof, in a court of competent jurisdiction, shall be punished by a fine in any sum not to exceed five thousand dollars ($5,-000.00), or by imprisonment in the county jail not to exceed thirty (30) days, or by both fine and imprisonment.

"Section 9. State may secure receiver—extent and manner. That in addition to any penalty imposed under the preceding section, any person, firm or corporation, violating the provisions of this act, shall be subject to have his or its producing property placed in the hands of a receiver by a court of competent jurisdiction, at the suit of the State through the Attorney General, or any county attorney, but such receivership shall only extend to the operating of producing wells and the marketing of the production thereof, under the provisions of this act.

"Section 10. Validity of relative sections of act. That the invalidity of any section, sub-division, clause or sentence of this act shall not in any manner effect the validity of the remaining portion thereof."

the statute infringes the constitutional guaranties which it invokes, and if the statute is susceptible of a construction which conforms to constitutional requirements, doubts must be resolved in favor of and not against the state. Toombs v. Citizens Bank of Waynesboro, 281 U. S. 643, 647, 50 S. Ct. 434, 74 L. Ed. 1088; United States Airways v. Shaw (D. C.) 43 F.(2d) 148, 150.

The statute has a dual aspect: First, as a penal statute to prevent waste and to protect the coequal rights of the several owners of land situate over a common pool of oil and gas to take from the common source of supply; and, second, a regulatory statute to be supplemented by rules, regulations, and orders of the commission to accomplish the same ends.

The penalties provided are for violations of the statute and no penalties are provided for violations of the rules and regulations promulgated by the commission.

We are of the opinion that the statute is too indefinite and uncertain to be sustained as a penal statute. Smith v. Cahoon, Sheriff, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. ——. An oil operator should not be required at the peril of severe criminal penalties to determine in the operation of his oil and gas wells whether he is committing economic waste or producing in excess of reasonable market demands because such terms are not defined in the act and are of uncertain and doubtful meaning. Likewise, a producer from a common source of supply should not be required to determine at the peril of such penalties whether he can operate at full production without committing economic waste or producing in excess of reasonable market demands.

Furthermore, it is unreasonable to require an operator to choose between two approved methods of operation, the results of which cannot be forecast with precise accuracy, in dealing with the ordinary problems confronted in the drilling and operation of oil and gas wells, at the peril, if he makes the wrong choice, that some underground waste will result and he thereby become subjected to such severe penalties, under a statute which affords no guide for the operator under such circumstances. However, except in one particular hereinafter mentioned, the validity of the act as a penal statute is not before us.

Oil and gas are natural resources which cannot be replaced, and the power of the state to impose reasonable regulations to prevent waste in the production, handling, and marketing thereof is undoubted. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 584, 44 L. Ed. 729; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Walls v. Midland Carbon Co., 254 U. S. 300, 41 S. Ct. 118, 65 L. Ed. 276; Cooley's Constitutional Limitations (8th Ed.) vol. 2, pp. 1319–1321.

The right of the state to make reasonable regulations for the protection of the coequal rights of landowners over a common pool of oil or gas to take from the common source of supply and to prevent one from taking in an undue proportion to the detriment of the others, and to prevent one from committing waste to the injury of the rights of the others, is well settled. Ohio Oil Co. v. Indiana, supra; Lindsley v. Natural Carbonic Gas Co., supra; Walls v. Midland Carbon Co., supra; Oxford Oil Co. v. Atlantic Oil Producing Co. (C. C. A.) 22 F.(2d) 597; Id. (D. C.) 16 F.(2d) 639; Marrs v. City of Oxford (D. C.) 24 F.(2d) 541; Id. (C. C. A.) 32 F.(2d) 134, 138, 67 A. L. R. 1336.

In the Ohio Oil Case the court said: "On the other hand, as to gas and oil the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right to the detriment of the others, or by waste by one or more to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste."

It is within the power of the Legislature to lay down general rules for the prevention of waste and for the protection of such coequal rights of the several owners of

land over a common pool and to delegate to an administrative agency the power to promulgate rules and regulations covering matters of detail for carrying such general rules into effect. Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 34 S. Ct. 359, 58 L. Ed. 713; Oxford Oil Co. v. Atlantic Oil Producing Co., supra; 12 C. J. p. 847, § 330.

■ Section 10 of the act provides "that the invalidity of any section, sub-division, clause or sentence of this act shall not in any manner affect the validity of the remaining portion thereof."

Sections 1, 3, 4, 5, 6, and 7 of the act provide a complete scheme for the enforcement through rules and regulations promulgated by the corporation commission of the general rules provided in sections 3 and 4 for the prevention of waste and for the protection of the coequal rights of the several owners of land over a single pool of oil and gas to take from the common source of supply, and may, in our opinion, be severed from the remaining portion of the act. Ohio River & W. R. Co. v. Dittey et al., 232 U. S. 576, 34 S. Ct. 372, 58 L. Ed. 737; Grand Trunk R. Co. of Canada v. Michigan R. R. Commission, 231 U. S. 457, 34 S. Ct. 152, 58 L. Ed. 310; Phoenix R. Co. v. Geary, 239 U. S. 277, 36 S. Ct. 45, 60 L. Ed. 287; Grenada Lbr. Co. v. Mississippi, 217 U. S. 433, 30 S. Ct. 535, 54 L. Ed. 826; Western Union Telegraph Co. v. City of Richmond, 224 U. S. 160, 32 S. Ct. 449, 56 L. Ed. 710.

■ We are not concerned with the question of whether such sections provide the best method of preventing waste and protecting such rights. The determination of that question is a legislative prerogative. Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 569, 31 S. Ct. 259, 55 L. Ed. 328; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165. The question here is whether such provisions are reasonably calculated to prevent such waste and protect such rights and are not an unreasonable interference with the rights of such owners to enjoy their property.

The production of oil and gas in excess of transportation or marketing facilities or in excess of market demands results in aboveground storage. At the time this statute was enacted, as shown by the orders of the commission, it resulted in large amounts of such storage in earthen reservoirs, with resultant waste through seepage and evaporation. It is a well-known fact in the oil industry that oil can be best stored underground. Further-

more, it is established by the evidence that to permit oil wells to flow at their maximum flush production results in the use of an excessive amount of gas pressure, an uneconomical and wasteful use of gas energy in lifting the oil, and a tremendous loss in ultimate recovery. This is of particular importance in a pool such as the Oklahoma City pool where the wells are of tremendous depth and the cost of artificially raising the oil will be unusually great. It is important that the wells shall be permitted to produce with the lowest practical gas-oil ratio, to the end that the gas pressure shall be preserved throughout a long period and the greatest ultimate recovery of gas and oil obtained.

■ Sections 3 and 4 of the act, when supplemented by proper rules and regulations of the commission, are reasonably calculated to prevent such wastes and to protect such coequal rights of the several owners of land over a common pool. And, in our opinion, are clearly within the competency of the Legislature.

■ It is asserted by counsel for plaintiff that the statute and the orders have for their purpose an interference with the law of supply and demand, by decreasing the normal supply of oil and gas and thereby raising the price, and that they are price-fixing in character. It may be that the restriction on production imposed by the statute will prevent a supply in excess of the market demands and thus indirectly tend to sustain the price of oil and gas. But such is not the main purpose of the statute, and the fact that it may have an indirect effect on prices does not, in our opinion, render it invalid.

■ Counsel for the plaintiff further contend that the provisions of section 6, authorizing the commission to punish as for contempt a violation of its orders, is a delegation of judicial power to a legislative branch of the government, in violation of section 1, article 4, of the Oklahoma Constitution. The commission has not invoked that provision of the act for the enforcement of the proration orders against the plaintiff and the validity of such portion of section 6 is not here presented. If it is in fact invalid, the orders of the commission may be enforced by appropriate proceedings in mandamus or injunction. 51 C. J. 83, § 149.

### Validity of the Orders.

■ Counsel for plaintiff contend that the orders themselves are void: First, because they have for their object the fixing of

prices by limiting the supply of oil; second, because they are predicated on information furnished by agents of the commission, who receive a salary for their work from certain of the producers in the fields affected by such orders; and, third, because no lawful gauges have been taken of the wells in such fields, as required by section 5 of the act.

The theory upon which the orders are predicated is that oil from a given pool shall not be produced in excess of the market demands therefor in order to prevent wasteful storage and wasteful use of gas pressure in lifting the oil.

Counsel for plaintiff assert that, since it is able to take oil in excess of the amounts permitted by such orders and to transport and market the same without the commission of any waste, a denial of its right so to do amounts to a deprivation of its property in contravention of the Fourteenth Amendment. The plaintiff is a so-called integrated producer; that is, it owns both producing wells, pipe lines, refineries, and marketing facilities. Other producers have no pipe line, refinery, or marketing facilities, and if they should be permitted to produce in excess of market demands they would have to store the same and this would result in waste. On the contrary, if plaintiff should be permitted to take all the oil it could utilize without waste, it would encroach upon the rights of other producers not having pipe line, refinery, and marketing facilities, to take from the common source of supply. Under these circumstances, we are of the opinion that the limiting of the taking to the market demands is a reasonable regulation for the prevention of waste and the protection of the coequal rights of the owners of land over such pool. "Where the public interest is involved preferment of that interest over the property interest of the individual, * * * is one of the distinguishing characteristics of every exercise of the police power which affects property." Miller v. Schoene, 276 U. S. 272, 280, 48 S. Ct. 246, 247, 72 L. Ed. 568, and cases there cited.

As observed with respect to the act itself, the object of the orders is to prevent waste and to protect the coequal rights of the owners of land over the common pool, and the fact that such orders tend to prevent the oversupply of oil and gas in excess of market demands and indirectly affect the prices thereof, does not make them price-fixing in character, and for that reason invalid.

The employment by the commission of agents and employees who are paid by groups of producers in the fields affected by such orders to gather the data and information on which such orders are in part predicated is subject to condemnation. It is only calculated to breed suspicion and distrust and to destroy confidence in the integrity of the commission. However, the evidence does not establish that such agents and employees have been guilty of favoritism or dishonesty, or that the commission has acted arbitrarily or discriminated in favor of the groups paying such agents. Furthermore, while the system is objectionable, it has been in vogue over a long period of time, during which a session of the state Legislature occurred. Such Legislature did not see fit to provide any funds with which to pay such agents and thereby gave implied legislative sanction to the practice.

While we think the practice of employing agents paid by producers interested in such orders should be discontinued, we find no basis in the evidence because thereof for striking down the orders.

The fact that the Seminole field is permitted a greater percentage of its potential production than is the Oklahoma City field is not necessarily a discrimination in favor of the former. The Seminole field is an older one, is more favorably located with reference to the large interstate pipe lines, and naturally has a larger market demand. It has passed the period of flush production. These circumstances justify a larger percentage of allowable production for the Seminole field.

Section 5 provides that for the purpose of determining proportionate production under section 4, a gauge of each well shall be taken under rules and regulations prescribed by the commission. The act leaves the method and details for taking such gauges to the commission. If the gauges result in permitting each owner to take the same proportion of his actual potential production, it is immaterial what method of gauging is used or whether potential production is determined by measurement of actual production. A gauge of the wells in the Oklahoma City field at the same time with all wells open to full production would be physically impossible. The available storage and transportation facilities would be wholly inadequate to handle the oil produced. The method employed in the Oklahoma City and Seminole fields arrived at approximately accurate results. The

orders fixed the allowable of every producing well in the Oklahoma City field at substantially the same relative proportion of their respective potentials. They did likewise in the other fields. We think there was a substantial compliance with section 5 of the act, and that no discrimination between producing wells resulted from the method by which the potentials thereof were determined. The Validity of the State Court Proceedings.

The facts with reference to such proceedings are set forth in paragraph 34 of the third amended and supplemental bill of complaint and need not be repeated here. They are predicated on the provisions of section 9 of the act. This provision is penal in character and is for the purpose of punishing violations of the provisions of the act itself, (not the orders of the commission), as a criminal statute. For the reasons hereinbefore indicated, we think this section is void and that such proceedings in the state courts should be enjoined.

### Interstate Commerce.

We are clearly of the opinion that the scheme of proration is not invalid as a regulation of or burden on interstate commerce. It is true that a substantial portion of the oil produced in this state goes into the channel of such commerce. But in order to conflict with the regulatory power of Congress, there must be a direct burden thereon. In this case, the interference is entirely too remote in character. The principle is too well settled to require citation, that the congressional power of regulation attaches only when interstate transportation has begun. Proration enforced under state powers cannot be said to affect commerce in oil to which producers have acquired no title. While they have a right to take the oil, yet title does not vest in it until it is reduced to possession. Ohio Oil Co. v. Indiana, supra; Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 3 A. L. R. 352; Alexander v. King (C. C. A.) 46 F. (2d) 235. The production of oil is analogous to the manufacture of goods or the mining of coal. Neither is interstate commerce, although the product may be later shipped to other states. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Delaware, L. & W. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397. See, also, West v. Kansas Nat. Gas Co., 221 U. S. 229, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193; Pennsylvania v. West Virginia, 262 U. S. 553, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A. L. R. 300; Foster-Fountain Packing Co. v. Haydel, 278 U. S. 1, 49 S. Ct. 1, 73 L. Ed. 147.

These are the views of a majority of the court. We have not taken the time necessary to prepare a more formal opinion, because we deemed it important to make an early disposition of the cause.

KENNAMER, District Judge (dissenting).

I concur in the opinion of the majority of the court, holding the penalty provisions of the Conservation Act unconstitutional, and that the corporation commission has power under the regulatory provisions of the act to enter orders enjoining oil operators committing actual waste in the production of oil and gas. I dissent from that part of the opinion sustaining the orders of the commission permitting the administration of the Conservation Act through privately paid agents of interested parties in the production and marketing of oil and gas. I am further of the opinion that the orders of the commission are discriminatory and enforced in an unconstitutional manner. I shall file a formal dissenting opinion setting forth my views.

KENNAMER, District Judge (dissenting).

Under the provisions of the Act approved February 11, 1915 (S. L. 1915, c. 25, p. 35), sections 7954–7963, inc., C. O. S. 1921, the corporation commission of Oklahoma is vested with jurisdiction to hear any proceeding instituted by any person, firm, or corporation, or the Attorney General on behalf of the state, involving any questions relating to the enforcement of the act, and to determine all questions of fact involved in such proceeding.

The object of complainant's action instituted in this court is to restrain the enforcement of certain orders of the corporation commission restricting the amount of oil complainant may produce from its properties within certain oil fields in the state of Oklahoma. Such orders are designated as proration orders. The statute upon which the proration orders are bottomed is herein attacked as unconstitutional, and the orders made under the authority of the statute are attacked as unconstitutional in that they deny the complainant due process of law. The act involved is set out in full in the majority opinion.

The material allegations of complainant's bill and the evidence introduced at the trial of the cause disclose that complainant is a corporation organized and existing under and by virtue of the laws of the state of New Mexico, and has been duly authorized to transact business within the state of Oklahoma, with its principal office and business located in the city of Enid, Okl. It is engaged in the business of producing, transporting, refining, and marketing petroleum and natural gas, and their products. It owns and operates an oil refinery at Enid, Okl., with a daily capacity of approximately 17,000 barrels of crude oil. It refines and manufactures gasoline, kerosene, lubricating oil, waxes, and other products. In connection with its refinery, it operates approximately 725 tank cars for the distribution of its refined products among its customers and trade in Oklahoma, Texas, Colorado, Kansas, Arkansas, and many other states. It has and operates approximately 470 miles of pipe lines for the transportation of its products, 263 retail gasoline filling stations, and 256 wholesale stations in various states. It has 45 producing oil and gas leases and many undeveloped leases, all representing an investment of several million dollars. It has made a large investment in leases in the Oklahoma City field and has several producing wells equipped at an expenditure of several hundred thousand dollars. On or about June 30, 1930, the corporation commission of the state of Oklahoma entered an order entitled "Order No. 5181, Cause No. 10146," which prescribed the allowable production from each of the principal oil producing fields for the state of Oklahoma, which included the complainant's properties, and prescribed rules and regulations governing the production of oil in said fields, and on October 28, 1930, made Order No. 5369, and from time to time and until within a few days of the trial of this cause have amended and supplemented said orders so as to prorate the amount of production that may be produced from the various properties of the complainant based upon the estimated potential production of the various oil fields of the state of Oklahoma. Said orders purport to allow from time to time the number of barrels of crude oil to be produced daily from the oil fields of the state of Oklahoma, and said orders recite in support thereof that the number of barrels of crude oil allowed to be produced represent the reasonable market demands for crude oil from said state. The defendants have appointed and designated as their agents to enforce the orders Otto B. Bradford, commonly known as an umpire, for the Oklahoma City field, and Ray H. Collins, known as an umpire, for the state at large and especially the greater Seminole field. These umpires are paid large and lucrative salaries through voluntary contributions made by various oil companies operating in the various oil fields of the state. These contributing oil companies have formed and designated an "Operator's Committee." The Operator's Committee represents oil companies that are competitors of complainant in the business of producing, or refining, and marketing crude oil and its by-products.

The jurisdiction of this court to determine the constitutionality of the statute and the orders entered under the authority of the statute was not seriously questioned at the hearing. This is not an action against the state in violation of the Eleventh Amendment to the Constitution of the United States. An action to restrain an officer of the state from acting under a statute alleged to be in violation of the Constitution of the United States, or otherwise violating a citizen's constitutional rights, is not a suit against the state.

Mr. Chief Justice White, speaking for a unanimous court, in Home Telephone & Telegraph Co. v. Los Angeles, 227 U. S. 278, 33 S. Ct. 312, 315, 57 L. Ed. 510, held that the prohibitions and guaranties of the Fourteenth Amendment to the National Constitution are addressed to, and control, not only the states, but also every person, whether natural or juridical, who is the repository of state power, and among other things said: "Here again the settled construction of the Amendment is that it presupposes the possibility of an abuse by a state officer or representative of the powers possessed, and deals with such a contingency. It provides, therefore, for a case where one who is in possession of state power uses that power to the doing of the wrongs which the amendment forbids, even although the consummation of the wrong may not be within the powers possessed, if the commission of the wrong itself is rendered possible or is efficiently aided by the state authority lodged in the wrongdoer. That is to say, the theory of the Amendment is that where an officer or other representative of a state, in the exercise of the authority with which he is clothed, *misuses the power possessed to do a wrong forbidden by the Amendment, inquiry concerning whether the state has authorized the wrong is irrelevant, and the Federal judicial power is competent*

to afford redress for the wrong by dealing with the officer and the result of his exertion of power." (Italics mine.)

Suits in the federal court to restrain the Oklahoma corporation commissioners from using the color of their office to deny a citizen or corporation rights guaranteed by the Fourteenth Amendment have been frequently maintained. Oklahoma Operating Co. v. Love, 252 U. S. 331, 40 S. Ct. 338, 64 L. Ed. 596; Oklahoma Gin Co. v. State of Oklahoma et al., 252 U. S. 339, 40 S. Ct. 341, 64 L. Ed. 600. See, also, Georgia Power Co. v. Decatur, 281 U. S. 505, 50 S. Ct. 369, 74 L. Ed. 999; Louisville & N. R. Co. v. Garrett, 231 U. S. 313, 34 S. Ct. 48, 58 L. Ed. 229; Lake Erie & Western R. Co. v. State Public Utilities Commission, 249 U. S. 422, 39 S. Ct. 345, 63 L. Ed. 684; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570; Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220; Virginia v. Rives, 100 U. S. 313, 25 L. Ed. 667; 25 C. J. § 53, page 743.

In Langford v. United States, 101 U. S. 341–346, 25 L. Ed. 1010, Mr. Justice Miller, speaking for the court, said: "The maxim, that the King can do no wrong, has no place in our system of constitutional law, as applicable either to the Government or to any of its officers."

If the national courts did not possess this jurisdiction, "the Constitution, steel framed, of the national fabric would fall in ruin." Free institutions, personal liberty, and property rights would be destroyed. See Looney, Attorney General of the State of Texas, v. Crane Co., 245 U. S. 178, 38 S. Ct. 85, 62 L. Ed. 230. Mr. Chief Justice White in disposing of the same contention made, at page 191 of 245 U. S., 38 S. Ct. 85, 88, said: "There is a contention to which we have hitherto postponed referring, that the court below was without jurisdiction because the suit against the state officers to enjoin them from enforcing the statutes in the discharge of duties resting upon them was in substance and effect a suit against the state within the meaning of the Eleventh Amendment. But the unsoundness of the contention has been so completely established that we need only refer to the leading authorities. Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Western Union Telegraph Co. v. Andrews, 216 U. S. 165, 30 S. Ct. 286, 54 L. Ed. 430; Home Telephone & Telegraph Co.

v. Los Angeles, 227 U. S. 278, 33 S. Ct. 312, 57 L. Ed. 510."

In Terrace v. Thompson, 263 U. S. 197, 214, 44 S. Ct. 15, 17, 68 L. Ed. 255, the Supreme Court of the United States held: "Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravenes the federal Constitution wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable."

The conclusion reached by my distinguished colleagues, "that the statute is too indefinite and uncertain to be sustained as a penal statute," cannot be seriously controverted. The drastic provisions of the statute subject an oil operator to a penalty of $5,000 fine, 30 days in jail, or both, in the discretion of the court when such operator committed economic waste, underground waste, waste incidental to production in excess of transportation facilities, or produces his oil in excess of reasonable market demands, and that his property in a suit by the state, through the Attorney General or any county attorney, may be placed in an indeterminate receivership. It was held in Connally v. General Construction Co., 269 U. S. 386, 46 S. Ct. 126, 127, 70 L. Ed. 322, that: "A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." The power of the state to provide reasonable regulations to prevent actual waste, or wasteful utilization in the production and marketing of oil and gas, is well established. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Walls v. Midland Carbon Co., 254 U. S. 300, 41 S. Ct. 118, 65 L. Ed. 276. The reason for the rule is that waste of the natural resources of the state is not only detrimental to the common weal, but also injuriously affects the rights of landowners over a common pool of oil or gas, and all such owners are entitled to an equal privilege of reducing oil and gas to possession. Ohio Oil Co. v. Indiana, supra. I cannot subscribe to the conclusion that the owners of land in a common oil pool own such oil and gas in common, and the right of one owner to reduce oil and gas underlying the surface of his land to possession is dependent upon the ability of another

owner to reduce the oil and gas beneath the surface of his land to possession. No such rule of property exists in the state of Oklahoma.

The right of an owner of land within Oklahoma to drill wells and reduce oil and gas to possession which lies beneath his land is a property right protected by the Fourteenth Amendment to the Federal Constitution. The Oklahoma Supreme Court has repeatedly followed the rule that an estate in fee simple in lands in Oklahoma includes all oil and gas in place in and under the land so long as it remains therein, and the owner of such land has a vested right to use it and to enjoy the profits accruing therefrom, since without the latter the former cannot be of value. Wright v. Carter Oil Co., 97 Okl. 46, 223 P. 835; Green v. Biddle, 8 Wheat. 1–76, 5 L. Ed. 566; Terrace v. Thompson, 263 U. S. 215, 44 S. Ct. 15, 68 L. Ed. 274.

In the case of Wright v. Carter Oil Co., supra, the Oklahoma Supreme Court said: "The right to reduce oil and gas to possession is a valuable property right." In the same case, the court held that "oil and gas belong to the owner of the land and are a part of it so long as they are on it, or in it, and subject to his control, but when they escape and go into other land, or come under another's control through the natural reservoir, the title of the former owner is gone." Thus, an established rule of property has grown around oil and gas, and such property rights are subject to protection as other property rights.

In Ohio Oil Co. v. Indiana, supra, the court said: "On the other hand, as to gas and oil the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property." In West v. Kansas Natural Gas Co., 221 U. S. 229, 31 S. Ct. 564, 571, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193, the court in referring to the opinion of the court in Ohio Oil Co. v. Indiana, supra, said: "It surely cannot need argument to show that if they could not be deprived of the right to reduce the gas to possession, they could not be deprived of any right attached to it when in possession." The trial court in the cited case, in construing an act of the Legislature of Oklahoma prohibiting the transportation of natural gas in interstate commerce, held (Kansas Nat. Gas Co. v. Haskell [C. C.] 172 F. 545) that natural gas found within the territorial limits of a state was not a product

which the state may conserve and preserve by law as a thing in which the people of the state have a common interest, as wild animals, but that it was an absolute property right, of which the owner cannot be deprived without just compensation.

The Supreme Court of the United States, in Brown v. Spilman, 155 U. S. 665, at page 669, 15 S. Ct. 245, 247, 39 L. Ed. 304, said: "Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have a fixed situs, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are part of it, so long as they are on it or in it or subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property. Brown v. Vandergrift, 80 Pa. 142, 147; Westmoreland & C. Nat. Gas Co.'s Appeal, 130 Pa. 235, 18 A. 724 [5 L. R. A. 731]."

While the state, in the exercise of its police power, has the power, through appropriate legislation, to protect the public morals, health, and safety, it cannot take private property from one person and transfer it to another for the private use and benefit of such person. The exercise of the police power is subject to constitutional limitations. "The chief restriction on this class of legislation is that vested rights must not be disturbed." Cooley's Constitutional Limitations, p. 744.

In Lawton v. Steele, 152 U. S. 133, 14 S. Ct. 499, 501, 38 L. Ed. 385, the court said: "To justify the state in thus interposing its authority in behalf of the public, it must appear—First, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations; in other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

The state has no title to oil and gas in place, and is without power to appropriate the oil and gas in and under the lands of one owner to the use and benefit of another owner. The only interest the state has under its police power is to prevent actual waste and to provide equal privileges to every landowner to reduce such products to possession and place them in the channels of legitimate commerce. The state exceeds its constitutional authority when, under the pretense of preventing waste, it attempts to regulate market demands, and for the purpose of regulating and controlling the price at which the owner of oil and gas, after it has been reduced to possession, must market such product. It is plain from the provisions of section 2 of the act that it is a price-fixing statute. The act empowers the commission to determine at what price oil and gas may be marketed. In the presentation of the application for temporary injunction counsel for the defendants conceded that section 2 of the act was invalid as a price fixing statute. The orders of the commission recite that because of market demands the daily production of the state of Oklahoma must be restricted to approximately 550,000 barrels of oil daily, and the commission attempts by its orders, not only to restrict the daily amount of production, but also to prorate the markets among the various oil pools of the state. It is only reasonable to infer from the language employed in the orders of the commission and all the evidence introduced on the trial of the cause that the sole purpose of the commission in restricting the amounts of daily production in the state of Oklahoma was for the purpose of requiring all owners of oil and gas to market it at what is commonly termed the "posted price." The "posted price" is simply a price agreed to be paid by the purchasing companies that substantially constitute the Operator's Committee.

It is the contention of counsel for the defendants that if the amount of oil to be produced is not restricted under the proration orders of the commission it will result in waste through storage of crude oil, especially storage in earthen tanks. Aside from a rule prohibiting storage in earthen tanks. the commission has in no manner undertaken to regulate the storage of crude oil. It is a matter of common knowledge that millions of barrels of crude oil are now confined in storage. If the Legislature deems storage of oil in earthen tanks wasteful, and there is no evidence that such practice has been engaged in, during recent years, it can pass a brief act prohibiting such storage. The evidence is uncontroverted that the complainant in this case has been and is capable of producing, refining, and marketing its products without waste.

Producing, refining, and marketing crude oil is not a public service business. The producer does not devote his property to a public use so as to give the state the power to regulate it like railroads and other public utilities. Charles Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; and Tyson & Bro.-United Theatre Ticket Offices v. Banton, 273 U. S. 430, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236. It is also well settled that the Legislature, neither directly nor through the corporation commission, can regulate or fix the price of crude oil. The producer has the right under the Fourteenth Amendment to the National Constitution to fix his own price. Williams v. Standard Oil Co., 278 U. S. 239, 49 S. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596; Tyson & Bro.-United Theatre Ticket Offices v. Banton, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236; Charles Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; Fairmont Creamery Co. v. State of Minnesota, 274 U. S. 1, 47 S. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163; and Ribnik v. McBride, 277 U. S. 350, 48 S. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327.

With all deference to the opinion of my associates, I cannot escape the conclusion that section 4 of the act is no more nor less than a part of the legislative scheme to fix prices for crude oil and that it does not provide for a fair and equitable proportionate taking by separate operators in the common field. Section 4 does not purport to require equitable taking except "whenever the full production from any common source of supply * * * can only be obtained under conditions constituting *waste as herein defined,*" which must mean that a person "having the right to drill into and produce oil from any such common source of supply, may take therefrom only such proportion of all crude oil and petroleum that may be produced therefrom, without waste, as the production of the well or wells of any such person, firm or corporation, bears to the total production of such common source of supply," whenever, quoting section 2, "there is not a market demand therefor at the well at a price equivalent to the actual value of such crude oil or petroleum," as determined by

the commission. Section 4 means that whenever there is not a market at the price fixed by the corporation commission for "the full production from any common source of supply of crude oil or petroleum in this State," then "any person, firm or corporation, having the right to drill into and produce oil from any such common source of supply, may take therefrom only such proportion of all crude oil and petroleum that may be produced therefrom" and sold "at the well at a price equivalent to the actual value of such crude oil or petroleum" as determined by the corporation commission under the authority attempted to be conferred upon it by section 2 of the act. If this is not the correct construction and the Legislature intended to authorize the commission to enforce in the oil fields "a just distribution, to arise from the enjoyment" by the operators in that field "of their privilege to reduce to possession," then why did not the Legislature prohibit an operator from pumping his wells unless his adjoining neighbor in the same pool has facilities for pumping oil from the common source (and an operator using a pump may restrain an adjoining operator from leaving open unproducing wells on his property the effect of which is to interfere with the action of the pump, Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206, 5 A. L. R. 411 and note; Bassell v. West Virginia Central Gas Co., 86 W. Va. 198, 103 S. E. 116, 12 A. L. R. 1398; Thornton on Oil & Gas (3d Ed.) vol. 1, § 32), and why did not the Legislature require an operator to shut down his offset wells in the event his adjoining neighbor's wells are choked up by casing and thereby prevented from producing? The so-called proportionate taking as provided for by section 4 only becomes operative in flush pools or in pools, the full production of which cannot find a market "at the well at a price equivalent to the actual value of such crude oil or petroleum" (section 2), as determined by the corporation commission. No provision is made prohibiting an operator from shooting his wells (Thornton on Oil & Gas [3d Ed.] vol. 1, § 33) and thereby artificially increasing the production of oil therefrom, although his neighbor may not be able to shoot his wells. It is clear to my mind that section 4 is nothing more than a mere mask behind which to disguise the price-fixing features of the statute. Section 4 clearly contemplates markets and not an equal distribution of the oil in a common pool. If "a just distribution, to arise from the enjoyment * * * of their privilege to reduce to pos-

session," using the language of the Ohio Oil Co. Case, was the purpose of section 4 of the act, it is strange it did not provide for taking into consideration acreage in figuring out the proportionate taking. Yet section 4 says that an operator can take out "only such proportion of all crude oil and petroleum that may be produced therefrom, *without waste,* as the production of the *well or wells* of any such person, firm or corporation, bears to the total production of such common source of supply." Acreage is ignored and an operator with two 5,000-barrel wells on 5 acres may take out of the common source of supply, under the provisions of section 4, as much oil as an operator with two 5,000-barrel wells on 20 acres in the same field. Proportionate taking per well is wholly inequitable if the Legislature intends to secure "a just distribution, to arise from the enjoyment * * * of their privilege to reduce to possession," because the operator with 20 acres has four times as much privilege as the operator with 5 acres in the same field. As further evidence that section 4 is concerned with markets and not with proportionate taking, the commission is authorized "to prevent unreasonable discrimination in favor of any one such common source of supply as against another," which must mean that the commission is authorized to prorate markets because we cannot attribute to the Legislature the absurdity involved in an authorization to the commission to prohibit, for instance, the Oklahoma City field, from draining the Seminole field or the Tonkawa field, separated by many miles and shown by the undisputed evidence to be incapable of draining any other field.

Severing section 2 from the act and declaring or conceding its unconstitutionality does not take it out of the act when we come to ascertain the legislative intent. An unconstitutional law or part of a law may be considered in order to ascertain the intent of the Legislature in another law or a part of the same law. Lewis' Sutherland Statutory Construction (2d Ed.) vol. 2, § 452.

The Illinois Supreme Court, in Baird v. Hutchinson, 179 Ill. 435, 53 N. E. 567, 568, said: "The meaning of the legislature must be gathered from all they have said, as well from that which is ineffective for want of power as from that which is authorized by law."

Mr. Justice Van Devanter, in Davis v. Wallace, 257 U. S. 478, 42 S. Ct. 164, 166, 66 L. Ed. 325, applied this rule and said that: "Where an excepting provision in a

statute is found unconstitutional, courts very generally hold that this does not work an enlargement of the scope or operation of other provisions with which that provision was enacted, and which it was intended to qualify or restrain." The court in that case also held that declaring a section of a statute unconstitutional "does not make the provision any the less a key to the intention of the Legislature."

Section 2 permeates the whole statute. It is the foundation of the statute and without it sections 3 and 4 are too vague and uncertain to vest any power in the corporation commission to make the rules and regulations assailed in this case. The act nowhere undertakes to vest the corporation commission with power to define waste. See Hewitt v. Board of Medical Examiners, 148 Cal. 590, 84 P. 39, 3 L. R. A. (N. S.) 896, 113 Am. St. Rep. 315, 7 Ann. Cas. 750; Cline v. Frink Dairy Co., 274 U. S. 445, 47 S. Ct. 681, 71 L. Ed. 1146.

As shown by the commission's various orders from June 30, 1930, down to date, it has purported to find a market demand for the entire state of Oklahoma, and then no doubt acting under the last clause in section 4 of the act, allocated those markets between various fields, a thing I do not believe the Legislature can constitutionally authorize, as it in effect takes one man's market and gives it to another. In the commission's order of June 30, 1930, it found that the existing wells in Oklahoma following the 1st day of July would produce approximately 1,362,000 barrels per day, and "that the daily demand in Oklahoma is and will be approximately 650,-000 barrels per day during the months of July, August and September, 1930." In the decretal part of the order it distributes this market among the various fields, naming them in a schedule setting forth their estimated potential and estimated actual production. This same scheme was followed in the succeeding orders. The commission in finding that the market demand in Oklahoma for certain months was a certain number of barrels evidently meant a market at the posted price, the then existing price, and not a market at a lower price. It is true that there may not be a market for more than 650,000 barrels per day at $1.07 a barrel, whereas, there may be a market for one million barrels per day at 75 cents per barrel.

Collins, umpire for the state at large, testified that although he did not make recommendations upon which the commission assigned market demand in the Oklahoma City field for the month of January, 1931, he did make recommendations for the Seminole and the balance of the state, and that although he had nothing to do with assigning market demands to the respective fields he made recommendations to the commission. On re-examination Collins testified that he tried to get an increase of the market demand for the Oklahoma City field, but that in doing so he never considered the price; that he never tried to get a market at a price below the posted price because it would be nearly impossible to find a seller; and that he had never considered it his business to try to get any market below the market price, all of which goes to show that the commission's so-called findings of market demands were based on a finding of the ability to sell at the then posted price and not at a lower price.

Defendants point to the enormous waste of gas and casinghead gas in the Oklahoma City field and introduced D. B. Bow as a witness, who testified that at a valuation of 6 cents a thousand the total value of gas and gasoline wasted during the year would be $29,400,000 if the field were opened up. But the commission has made no order requiring the producers to operate their wells on such a gas-oil ratio as will conserve the gas. The commission's orders have been directed at the suppression of the production of oil. During oral argument it was stated by counsel, and not denied, that the record before the special master shows that one 18-barrel oil well is operated under the commission's rules in the Oklahoma City field at an expenditure of over 3,000,000 cubic feet of gas per barrel. The commission must therefore either have construed section 7964 of the Oklahoma Comp. Stats. 1921, as authorizing the waste of gas without restriction when produced from an oil well, or otherwise has refused to enforce the statute passed in 1915 embodied in sections 7920 to 7922, inclusive, of the Oklahoma Comp. Stats. 1921, prohibiting the production of natural gas in such manner and under such conditions as constitute waste and providing that "whenever natural gas in commercial quantities, or a gas bearing stratum, known to contain natural gas in such quantity, is encountered in any well drilled for *oil or gas in this state,* such gas shall be confined to its original stratum until such time as the same can be produced and utilized without waste, and all such strata shall be adequately protected from infiltrating waters." Not having taken any steps to conserve the gas as authorized and directed by the Oklahoma Statutes of 1915, embodied in sections 7920 to 7922, Oklahoma Comp. Stats.

1921, my conclusion is that the commission has not concerned itself with conservation of the natural resources but with the suppression of the production of oil in order to decrease the supply and thus increase the price.

The statutes involved in Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Ohio Oil Co. v. Indiana, 177 U. S. 190–202, 20 S. Ct. 576, 44 L. Ed. 729, and Walls v. Midland Carbon Co., 254 U. S. 300, 41 S. Ct. 118, 65 L. Ed. 276, were enacted to prevent physical waste or the wasteful utilization of the oil or gas or water. There is no contention in this case that the complainant has wasted or will waste any of the oil or use it for a purpose other than useful.

In view of the fact that the Oklahoma Act does not (a) take into consideration acreage, or (b) prohibit the use of pumps to create an excessive flow of oil, or (c) closing offset well or wells when a stoppage of an adjoining operator's well is caused by losing the casing or other accident, or (d) make any provisions for equitable taking except "where the full production from any common source of supply of crude oil or petroleum * * * can only be obtained under conditions constituting waste," which must mean where there is not a sufficient market at a fixed price for all the oil, I conclude that the act and the orders of the commission made in pursuance thereof were intended to accomplish one result and that is price-fixing by regulating the law of supply and demand by statute and rules of the commission.

In McMillan et al. v. Railroad Commission of Texas et al. (D. C.) 51 F.(2d) 400, a recent decision by three federal judges, the court declined to be deceived by the railroad commission's proration orders purporting to have been made under the authority of the Texas oil conservation statute. Circuit Judge Hutcheson, speaking for the court composed of himself and District Judges West and Bryant, said:

"*Presumptively valid though such acts are, courts, bound to give effect not to fictions, but to realities, may not, in construing them, close their eyes to what all men can see. Disregarding pretense, subterfuge, and chicane, courts must, looking through form to substance, ascertain the true purpose of a statute not from its recitals of purpose, but from the operation and effect of it as applied and enforced.*" Smith v. [St. Louis & S. W.] Ry. Co., 181 U. S. 248, 21 S. Ct. 603, 45 L.

Ed. 847; Bailey v. Drexel Furn. Co., 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432; Lochner v. New York, 198 U. S. 64, 25 S. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133; Meyer v. Nebraska, 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446; Henderson v. New York, 92 U. S. 259, 23 L. Ed. 543; Chy Lung v. Freeman, 92 U. S. 275, 23 L. Ed. 550. * * *

"Especially must this be so when, as here, under the *thinly veiled pretense of going about to prevent physical waste* the commission has, in *co-operation with persons interested in raising and maintaining prices of oil and its refined products,* set on foot a plan which, seated in a desire to bring supply within the compass of demand, derives its impulse and springs from, and finds its scope and its extent in the attempt to control the delicate adjustment of market supply and demand, in order to bring and keep oil prices up." (Italics mine.)

In Near v. State of Minnesota, 283 U. S. 697, 51 S. Ct. 625, 628, 75 L. Ed. 1357, Mr. Chief Justice Hughes, speaking for the court, said: "With respect to these contentions it is enough to say that in passing upon constitutional questions the court has regard to substance and not to mere matters of form, and that, in accordance with familiar principles, the statute must be tested by its operation and effect. Henderson v. Mayor [of New York], 92 U. S. 259, 268, 23 L. Ed. 543; Bailey v. Alabama, 219 U. S. 219, 244, 31 S. Ct. 145, 55 L. Ed. 191; United States v. Reynolds, 235 U. S. 133, 148, 149, 35 S. Ct. 86, 59 L. Ed. 162; St. Louis Southwestern Railway Co. v. Arkansas, 235 U. S. 350, 362, 35 S. Ct. 99, 59 L. Ed. 265; Mountain Timber Company v. Washington, 243 U. S. 219, 237, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642."

I think the above rule should be applied in this case, and if applied it is plain that the purpose of the act and the commission's rules and regulations is to control prices of crude oil.

Special counsel, appointed by the Governor of the State to appear and represent the interest of the state on the trial of this case, stated in his brief and in his oral argument that the practice of employing umpires, charged with the duty of executing the orders of the commission, under the control of monopoly and paid by the Operator's Committee, was iniquitous. It is a matter of common knowledge that the Governor of the State, just a few days prior to the final ar-

guments on submission of this case to the court for decision, issued a public proclamation advising the purchasers of crude oil that unless the price was raised to $1 per barrel he would close down by executive order all the prorated wells in the oil fields of Oklahoma and call out the State Militia to enforce such order. It is a fact that he has executed such order by placing the wells of the complainant, and other producers, under martial law for the reason that the price of oil has not been raised to $1 per barrel, and he bases his authority for such action on the provisions of the act in controversy. This constitutes a construction of the act in question by the executive officers of the state. If there ever existed any doubt as to the intent of the Legislature in vesting the corporation commission with authority to enter proration orders restricting the production of oil and gas from "any common source of supply," which has involved the production of oil in so much uncertainty, surely no such doubt any longer exists. The act does not define "common source of supply," nor does the evidence shed any satisfactory light upon what is a "common source of supply." It only subjects the oil producer, under the circumstances involved, to speculation and conjecture and forces him to market his oil at the price determined by the commission to be in accordance with reasonable market demands.

The Supreme Court of the United States, in Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, held that public officers charged with the administration of a law, thus representing the state itself, may so oppressively enforce the law so as to amount to a practical denial of the equal protection of the laws secured by the Fourteenth Amendment to the Constitution of the United States. The court at page 373 of 118 U. S., 6 S. Ct. 1064, 1073, said: "Though the law itself be fair on its face, and impartial in appliance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."

It does not only appear from the evidence introduced in this case that the orders of the commission are grossly discriminatory, but we have the solemn admission of counsel representing the Governer of the State that the law in its operation under the sanction of the commission is administered under the control of monopoly. Furthermore, it appears from the official pronouncements of the Governor of the State that he assumes the act authorizes price-fixing and on that construction of the act he has fixed a minimum price of $1 per barrel and has closed the oil fields until that price is paid. In addition to the admission of counsel for the Governor that the administration of the law is under the domination of monopoly, the evidence discloses that the umpires, acting as the agents of the defendants in the administration of the law and in violation of the public policy of the state, are receiving lucrative salaries, one in the sum of $24,000 per year, with a large expense account, and the other in the sum of $7,200 per year, from operating companies in the prorated oil fields, and that the orders of the commission are based substantially upon information and evidence furnished by such umpires. Section 1570, C. O. S., 1921, makes it an offense for any executive officer to receive any emolument, gratuity, or reward for attempting or deferring the performance of any official duty, and the person violating the same is guilty of a misdemeanor. Section 1561, C. O. S., 1921, makes any person who executes any of the functions of a public office without having taken and duly filed the oath of office as required, guilty of a misdemeanor, and forfeits his right to such office. Umpires acting as agents of the corporation commission are public officers when appointed and selected in the manner required by the act. The manner of selection and payment of the umpires charged with the duty of administering the law is contrary to public policy and sound morals, and sufficient to render the orders of the commission so administered as violative of the constitutional rights of the complainant. To say that the Legislature has been in session since the practice has been followed and has not corrected the evil is no protection to the complainant. See Somerset Bank v. Edmund, 76 Ohio St. 396, 81 N. E. 641, 11 L. R. A. (N. S.) 1171, 10 Ann. Cas. 726.

In Tumey v. Ohio, 273 U. S. 510, 47 S. Ct. 437, 441, 71 L. Ed. 749, 50 A. L. R. 1243, in an opinion by Mr. Justice Taft, the court said: "But it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." Manifestly it is unfair to the complainant to be controlled by an umpire in the

production of its oil, selected by and paid by its competitors. Such a course of conduct is unfair and fundamentally unsound, and the orders of the commission authorizing any such course of conduct should be stricken down as violative of due process of law.

The commission's power under section 4 of the act remains in a state of suspension until a legal gauge of each well has been made as required by section 5 of the act. The commission cannot delegate to the individual operators, private persons, the power to gauge their own wells under the supervision of umpires paid by private persons and corporations. Before the commission can make and enforce any order or rule under section 4, if that section is valid, it must cause a gauge of the wells to be made by some state official or employee of the commission. It cannot delegate that authority to the operators and make the report of the operators to the umpire conclusive evidence of the potential production of the wells. No operator can determine the amount he is permitted to withdraw from the common source of supply "whenever the full production from any common source of supply of crude oil or petroleum * * * can only be obtained under the conditions constituting waste," or determine what is an equitable and fair taking from a common source of supply until all the wells in the field have been legally gauged. The commission could not delegate the authority to gauge wells to the Operators' Committee or to the operators themselves.

In State v. Crawford, 104 Kan. 141, 177 P. 360, 2 A. L. R. 880, the court said that "the Legislature cannot delegate to private individuals and private associations of persons the power to make obligatory rules concerning the management and care of property, nor provide that the breach of such rules shall be a penal offense."

This principle is upheld in Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210, and Eubank v. Richmond, 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123.

In my opinion complainant is entitled to a permanent injunction restraining the defendants from enforcing the rules and regulations in so far as they restrict the plaintiff's right to produce oil from its wells so long as it can do so without committing actual waste. The consuming public is entitled to purchase the refined products of crude oil in markets free from the control of monopoly and where fair competition prevails.