## DANCIGER OIL & REFINING CO. v. RAILROAD COMMISSION OF TEXAS et al.

### No. 7651.

Court of Civil Appeals of Texas. Austin.

March 23, 1932.

Rehearing Denied April 20, 1932.

S. A. L. Morgan, of Amarillo, I. J. Ringolsky, of Kansas City, Mo., and Charles L. Black, of Austin, for appellant.

Hines H. Baker, of Houston, John E. Kilgore, of Wichita Falls, Marion S. Church, of Dallas, Robert E. Hardwicke, of Ft. Worth, James V. Allred, Atty. Gen., and Maurice

Cheek and Fred Upchurch, Asst. Attys. Gen., for appellees.

BAUGH, J.

The Danciger Oil & Refining Company, a corporation, owner of certain oil and gas leases in the Panhandle district of Texas, on which it had in January, 1931, 42 oil wells with a potential producing capacity of approximately 5,200 barrels of oil daily, by this suit sought to enjoin the enforcement of the order of the railroad commission (hereinafter referred to as the commission), effective January 23, 1931, in which the production of oil in the state of Texas was limited to 644,253 barrels, that in the Panhandle district to 40,000, and that of appellant to its pro rata part thereof, amounting to approximately 25 per cent. of the potential production from its wells. A temporary injunction was granted, but this was subsequently dissolved upon a hearing before the court without a jury, from which order this appeal is prosecuted.

What is commonly known as the proration orders of the commission were issued on August 14, 1930, for a period of 90 days beginning August 27, limiting production in the state of Texas to 750,000 barrels of oil daily, and that of the Panhandle district to 80,000 barrels daily. Beginning November 25, 1930, and running for a period of 60 days, this order was renewed by the commission limiting state-wide production to 680,238 barrels daily, and that of the Panhandle district to 64,616. Upon the expiration of that order, the commission issued the order herein attacked, and which by its terms expired on April 1, 1931. This order recited that proper hearings had been had, and found that waste of oil and gas was taking place in Texas, and would continue unless prevented, from storage, dissipation of gas energy, encroaching of water in oil strata, creation of fire hazards, and evaporation and leakage resulting from unnecessary and excessive aboveground storage of oil in the fields; that in certain areas some wells, because market for their oil was afforded, were producing without restriction, while, because of a lack of market outlet others were curtailed, resulting in dissipation of gas energy, unequal withdrawals, and actual physical waste from encroachment of water; that, unless restriction of production be uniformly applied so as to limit production to an amount for which there exists a market demand, tremendous actual physical waste in the respects named would result; that by a field by field and district by district check or canvass, and from evidence before the commission, the actual demand for purchase and use of crude petroleum in the state had been determined for the period stated in the order, i. e., from January 23, 1931, to April 1, 1931; that, if production be limited in each district to the amount authorized and in the manner provided in the order, waste of oil and gas and of gas energy would be prevented or minimized; that uniform restriction of production in the various fields was essential to prevent waste and conserve the oil and gas; that production and outlet to market should be upon a fair and ratable basis. Immediately preceding the provision in the order fixing the allowable production in each field, the order recited: "It further appearing that the restriction of the production in the various districts to the amounts set out below, if made uniform in each field, in view of the potential capacities of the wells, will prevent, or at least minimize, the waste of oil and gas and of gas energy, and will also reduce the production so that it will equal the market demands."

Appellant presents fourteen propositions under which it contends that said orders were void. These may be reduced in substance to seven grounds of attack, as follows:

That said orders were void:

1. Because not authorized by statute, in that the commission had no authority to issue a general order covering the whole state, without hearing evidence as to each individual property or well, and determining whether each individual property or well was properly or improperly operated and was, as operated, committing physical waste.

2. Because the standard of curtailment of production was market demand, a standard not authorized by statute; and that such standard manifests an intention to prevent economic waste, a matter prohibited by statute.

3. Because, if authorized by statute, they are violative of the Fourteenth Amendment to the Federal Constitution, in that (a) they make the operators' right to produce oil depend upon the uncontrolled consent and economic desire of purchasers in the market, who thus fix the amount of oil that may be produced; and (b) "market demand" as a standard of curtailment of production is fatally indefinite and uncertain in meaning.

4. Because said orders are based upon the theory that storage of oil causes physical waste, yet they do not prohibit nor penalize storage; but do, by limiting production of all operators, impose an unfair burden on those who are not storing oil, such as appellant.

5. Because the enforcement of said orders was committed to private individuals, who were interested parties, and not in the employ of the state.

6. Because there was no competent evidence to show that the enforcement of such orders would prevent waste; and no competent evidence as to what the market demand was in the state nor in the Panhandle district.

7. Because said orders operate as a direct burden upon interstate commerce.

Before discussing the particular issues presented, perhaps some general observations would be helpful to a consideration of the case.

■■ The discovery of oil and gas deposits, the methods used in bringing them to the surface, and the varied uses to which such resources have come to be applied, are all matters of comparatively recent origin. While not specifically named in the constitutional amendment adopted in 1917, section 59 (a), art. 16, Texas Constitution, oil and gas have come to be universally recognized by courts and Legislatures as natural resources; and legislation looking to their conservation and the prevention of waste thereof has been enacted in practically every state where these resources have been discovered. See annotations in 24 A. L. R. 307; 51 A. L. R. 279; 67 A. L. R. 1346. That the states have authority under their police power to do so reasonably, and, when not in contravention of the Federal Constitution, has been repeatedly announced by the courts, both state and federal. Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729; Walls v. Midland Carbon Co., 254 U. S. 300, 41 S. Ct. 118, 65 L. Ed. 276; Oxford Oil Co. v. Atlantic Co. (C. C. A.) 22 F.(2d) 597; 12 C. J. 947; 6 R. C. L. 212; Summers Oil & Gas, p. 93; Julian Oil Co. v. Capshaw, 145 Okl. 237, 292 P. 841; People v. Associated Oil Co., 211 Cal. 93, 294 P. 717, 718; Humble Oil Co. v. Strauss (Tex. Civ. App.) 243 S. W. 528, 536; R. R. Com. v. Bass (Tex. Civ. App.) 10 S.W.(2d) 589. More cogent reasons for the conservation of such resources prevail than for the conservation of flood waters, water power, forests, etc, because the latter are renewed or replenished continuously by nature; whereas, the former, once destroyed or wasted, are irreplaceable. A compelling reason is added in Texas, in that the state has reserved to itself a vast amount of minerals under its public lands; and has set apart to its educational and eleemosynary institutions large quantities of land under which immense petroleum deposits are known to exist. It is a matter of common knowledge that the inhabitants of practically all the cities and towns of the state are now dependent largely upon natural gas as fuel for domestic and industrial purposes; and that petroleum products have become indispensable, not only to many railroads, but to what is now the universal method of transportation over the highways,· and to numerous branches of industry. These matters make the conservation of such resources of vital importance to the public welfare. In addition, taxes derived from their production now constitute a large portion of the state's revenues. These facts but emphasize the importance, in addition to the clear mandate of the Constitution itself, of the conservation of these resources for the general welfare of the public and to

the state itself. Nor do we think this interest, nor the power of the state to conserve such resources, is minimized in the least by the fact that in Texas these minerals are considered as owned in place by the owner of the surface, rather than that a community ownership in a common pool or deposit exists, as held in some of the other states. The power of the state to conserve them, where the public interest demands it, undoubtedly exists in either case.

The first oil and gas waste preventive legislation in this state was enacted in 1899. Articles 6004–6009, R. S. 1925. These statutes were supplemented in 1905 and in 1913. Articles 6010–6013. No agencies were then designated by the Legislature to enforce these laws. In 1917 pipe lines were declared by the Legislature to be common carriers and placed under the supervision of the railroad commission. Acts of 1917, chap. 30, p. 48. Subsequent to, and pursuant to, the adoption of section 59 (a), art. 16 of the Constitution, the Legislature in 1919 (chapter 155) undertook a more comprehensive regulation of the oil and gas industry with a view to preventing waste of these resources, and committed to the railroad commission the duty of making rules, enforcing such legislation, and carrying out the purposes of the Constitution; vesting in that body full power to effectuate those purposes. The subject has, due to the discovery and production of such vast resources in this state, been frequently before the Legislature since 1919. That there has been vast waste in this state of these valuable resources in the past decade is now universally known. A consideration of these legislative acts clearly discloses, we think, a realization by the Legislature that, due to the peculiar elements, characteristics, fugacious nature, varying locations, depths of location, variety of formation in which these resources are found, and the magnitude and multiplicity of, problems encountered in their production and conservation, it was the clear and express purpose and intention of the Legislature to vest in the commission broad and discretionary power and authority to carry out the duties imposed upon it, i. e., to prevent waste. Nowhere in this legislation prior to the Act of the First Called Session of the 42nd Legislature, approved Aug. 12, 1931, after the trial of this case (chapter 26, p. 46 [Vernon's Ann. Civ. St. arts. 6008, 6014, 6029, 6032, 6036, 6049c]), do we find any express limitation upon the powers of the commission in dealing with the subject; except that in the 1929 amendment to article 6014, R. S. 1925 (Acts 1929, c. 313, § 2), prohibiting waste, there was added: "Provided, however, this shall not be construed to mean economic waste."

The chief articles of the statute prohibiting waste and imposing duties upon the commission to prevent it are articles 6014, 6023,

and 6029, R. S. 1925. Article 6014, as it read when the orders attacked were issued, provided: "Neither natural gas nor crude petroleum shall be produced, transported, stored or used in such manner or under such conditions as to constitute waste; provided, however, this shall not be construed to mean economic waste. The term 'waste' in addition to its ordinary meaning, shall include permitting (a) escape into the open air of natural gas except as may be necessary in the drilling or operation of a well; (b) drowning with water of any stratum capable of producing oil or gas or both oil and gas in paying quantities; (c) underground waste; (d) any natural gas well to wastefully burn; (e) the wasteful utilization of natural gas; (f) the creation of unnecessary fire hazards."

Article 6023 confers upon the commission power and authority over all persons, firms, and corporations transporting through pipe lines, drilling for or producing oil or gas, and provides that "the Commission is authorized and empowered to make all necessary rules and regulations for the government and regulation of such persons, associations and corporations and their operations. * * * ".

Article 6029 makes it mandatory upon the commission to "make and enforce rules and regulations for the conservation of oil and gas"; and, after reciting seven specific duties enjoined upon it, provides in subdivision 8 thereof: "It shall do all things necessary for the conservation of oil and gas whether here especially enumerated or not, and shall establish such other rules and regulations as will be necessary to carry into effect this law and to conserve the oil and gas resources of the State."

Article 6042 provides: "Particular powers herein granted to the Commission shall not be construed to limit the general powers conferred by law, and until set aside or vacated by some order or decree of a court of competent jurisdiction, all orders of the Commission as to any matter within its jurisdiction shall be accepted as prima facie evidence of their validity."

Article 6046 provides: "The Commission when necessary, shall make and enforce rules and regulations either general in their nature or applicable to particular oil fields for the prevention of actual waste of oil or operations in the field dangerous to life or property."

 While title 102, R. S. 1925 (article 6004 et seq.), contains mandates and prohibitions as to what may or may not be done by producers of oil and gas, nowhere in these statutes, prior to the amendment of article 6014 in 1929, do we find any express limitations upon the powers of the commission in ascertaining what constituted waste, nor upon methods it might use to prevent it. Obviously, we think, the provisions of article 6014 are but a recital of some of the ways in which then known waste occurred, and were never intended by the Legislature as an exclusive definition of the only kinds of waste which the Legislature recognized, nor as a denial to the commission of power to deal with any other kind of waste no matter how committed. Nor can article 6029, in enumerating some of the things the commission should do, be construed as an implied denial to it of authority to do anything else than what was expressly provided in the statute itself. We think the statutes above quoted convincingly demonstrate the contrary.

 We recognize the rule that, in the regulation and control of private rights and properties of individuals by administrative agencies of the state, the interests of the individual, so far as consonant with the public welfare, should be jealously guarded and protected; and no authority not clearly delegated to such agency by the Legislature, or necessarily implied from that expressly delegated, should be sustained. Such was the holding of this court in Commercial Standard Fire Ins. Co. v. Board of Insurance Commissioners, 34 S.W.(2d) 343, and authorities there cited, urged by appellant. Because of the nature of the subject-matter involved here, however, that line of cases does not furnish an accurate analogy. In the instant case, the commission, as the designated agency of the Legislature, was given the mandatory direction to carry out the mandate of the Constitution to prevent waste of the natural resources. That duty was expressly enjoined upon it. In construing the validity of its acts in undertaking to do so, we must consider the nature, character, and extent of the subject-matter placed under its jurisdiction and the purposes sought by the Legislature to be accomplished. So considered, any order of the commission bearing a reasonable relationship to the general duty imposed upon the commission, which is not unreasonable nor unjust, and which is reasonably calculated to prevent waste, comes, if not within the express powers granted to the commission, clearly within those necessarily implied; and is "confined to the obvious purposes and directions of the statute." Texas & P. R. Co. v. I. C. C., 162 U. S. 197, 16 S. Ct. 666, 674, 40 L. Ed. 940.

 Nor was it necessary for the commission to base the order here attacked upon the facts relative to the commission of waste in the operation of any one particular property. That contention would undoubtedly be correct if a penalty were sought to be invoked against a particular operator, or an order issued specifically applicable to a particular property. The commission had the power to issue such order as to a particular lease, if particular conditions of waste existed with reference thereto, to prevent which.

necessitated the issuance of such order; or if a general order affecting all wells alike, in a particular field, failed to prevent waste in a particular instance. But the order here attacked was obviously issued under the express provisions of article 6046 quoted above. The record discloses that there were more than 1,900 wells in the Panhandle area and more than 50,000 in the state, when the orders were issued. To make each well or each lease a unit of regulation and the validity of a general order dependent upon whether waste was taking place as to it would obviously render impossible the enforcement of any conservation measure, general in scope, as was contemplated by the statute. Appellant might, in the operation of its leases, under approved methods, if considered as a unit, extract without physical waste as to its particular leases the maximum amount of oil or gas recoverable therefrom. But if in doing so it causes what has come to be commonly known to that industry as "coning," "water channeling," gas dissipation, or destruction of "reservoir energy" available to the reservoir or pool as a whole, and so trap off and lose oil that would otherwise be recovered by the owners of adjacent lands, and so reduce the ultimate aggregate recovery from the field, waste, as contemplated by the law, would necessarily result. No particular lease or well can therefore be taken as a unit, but must be considered in its relation to adjacent leases or wells, with a view to conserving the whole, and is subject to regulation accordingly. Sic utere tuo ut non alienum lædas.

We consider next the contention that the orders are void because the measure of curtailing production is that of market demand, or outlet for the oil produced. Appellant insists that the fact that the statutes nowhere authorize such standard of curtailment necessarily implies a denial to the commission of the power to adopt such standard.

Nowhere in the laws in force when the order was issued do we find any express authority to curtail production at all, and certainly none expressly authorizing proration or ratable taking of oil from an oil pool or field, in order to prevent waste, even when waste is admittedly taking place. Nor do we find any effort to prescribe what are "the most approved methods" of production. Obviously that would be impracticable, if not impossible. Yet article 6015 imposes upon operators the duty of using only such methods and gives the commission power to compel them to do so. There can be no question but that, under the conditions prevailing in the Panhandle at the time, as clearly shown by the evidence, a vast amount of physical waste of oil and gas both underground and aboveground was being committed. The commission was vested with power, and it was made its express duty to prevent it. To say that we must look to the statute for

every method or standard of regulation by which the commission could act in preventing such waste would be to nullify the conservation laws. The commission undoubtedly had authority to adopt and enforce any approved method available in the light of experience of those engaged in the industry, of scientific knowledge acquired as to the subject-matter, and of the characteristics of the resources themselves. In doing so it could rely upon the knowledge, experience, and advice of geologists, and experienced oil producers, and look to the methods used in other states in coping with the problem.

The federal court in MacMillan v. Railroad Commission of Texas (D. C.) 51 F.(2d) 400, 402, a case urgently relied upon by appellant, enjoined the enforcement of a proration order of the commission in the East Texas field, and held that plaintiff in that case had shown that proration, or ratable withdrawals, would have some effect to prevent waste, but that "in the light of present knowledge this was largely theory and speculation. * * *" That opinion does not disclose what "light of present knowledge" was before the court. But in the instant case there was ample evidence to show that in the Panhandle district, where the potential production was far beyond the available outlet, where some wells were operated to capacity, while others were shut down because they could not store nor dispose of their oil, and where aboveground storage was already excessive—in brief, where conditions prevailed causing physical waste—proration of output or ratable taking from the field within prescribed limits was a reasonable and effective method of minimizing that waste. Not only was there ample proof by competent evidence to show a reasonable relation between proration of production from the field as a whole, and a reduction thereof below its potential and the prevention of waste, but such method of preventing waste arising from overproduction has been recognized and authorized as a reasonable and effective method of doing so by the Legislature of Kansas (Laws of Kansas 1931, chap. 226, p. 332, § 3); of California (see People v. Associated Oil Co., 211 Cal. 93, 294 P. 717); of Oklahoma (Oklahoma Comp. Stats. § 7957, Julian Oil & R. Co. v. Capshaw, 145 Okl. 237, 292 P. 841). The statutes of Oklahoma and California have been upheld as valid by the courts of last resort of those states, and that of Oklahoma by the federal court in Champlin Ref. Co. et al. v. Corporation Commission of State of Oklahoma (D. C.) 51 F.(2d) 823. And the Texas Legislature, in a session called by the Governor in 1931 for the express purpose of conserving these natural resources, and the prevention of appalling waste, the journals of which show that the opinion in the MacMillan Case was considered and had some bearing on the acts then passed, expressly authorized the commission to curtail

and prorate production as an effective means of preventing physical waste. Acts 42d Leg. 1st C. S., chap. 26, p. 46, § 7 (article 6049c, § 7, Vernon's Supp. to R. S. 1925).

While we have great deference and regard for opinion of the court that decided the MacMillan Case, in the light of the evidence in this record, and of the fact that the Legislatures of the four leading oil-producing states of the nation have recognized and authorized proration as a reasonable and effective means of preventing underground waste, we are constrained to differ with the conclusion of that honorable court that results of such method are largely "theory and speculation." And since the court in that case did not base its decision on any federal question, but on the ground that the powers claimed by the commission under the state law had not been delegated to it by that law, we must differ with that estimable court and respectfully decline to follow its construction of our statute. The rule of construction in such cases is that the federal courts follow the interpretation and construction placed by the courts of last resort of the state upon its own statutes where no federal question is involved; and not that the state court must follow the construction thereof by an inferior federal court.

Since the commission was, we conclude, authorized to curtail production below the potential of the field and to prorate that production to make withdrawals uniform throughout the field, thus using a method reasonably calculated to prevent physical waste, the next inquiry is whether it was authorized to use "market demand," as ascertained by the commission, as a standard of measurement by which to curtail the amount of the production. Appellant insists that the fact that the order restricts production to market demand shows an intention on the part of the commission to prevent economic waste, excluded by the statute; and that, whether the commission so intended or not, such was the necessary result of the order, and it must therefore fall.

Just what the Legislature meant by "economic waste" is not clear. It is obvious we think that physical waste of such resources must of necessity result in economic waste. But it is equally true that economic waste by producers, such as expenditure upon a given well or lease, in bringing in production thereon, of a sum in excess of what the well or lease would return to such producers financially, does not necessarily mean physical waste of the natural resource. In the latter case there would be economic waste of the resources of the producer; but, if his wells were properly operated under regulation, there would be no physical waste of the natural resource itself, which is the only matter in which the state and the public are interested. That sort of waste, or economic loss in the production, sale, use, or disposition by the owners or operators of oil properly produced by them without physical waste of the resource itself, is probably what the Legislature intended; and which is a character of waste the commission was without authority to prevent. Consequently the commission had no authority to issue an order which had for its purpose the control or regulation of economic conditions, or which was designed to affect prices, or to prevent economic waste. But such limitation is not a denial to the commission of power to take into consideration an economic standard, or economic conditions, if such conditions bear a direct or reasonable relationship to physical waste. That is, if economic conditions be such as to cause physical waste of these valuable resources, and it is necessary for the commission, in order to prevent that waste, to regulate production with reference to an economic standard or else permit such physical waste to continue, undoubtedly, we think, there is sufficient reasonable relationship between the power granted, the end sought to be attained, and the method used, to sustain the orders based thereon.

The evidence in this case was voluminous. It would be impracticable to attempt to even summarize it. It showed that tremendous physical waste was occurring in the Panhandle area when the orders attacked were issued. That this condition was brought about by production far in excess of any market outlet for the oil. That as a result vast quantities of oil had been stored, approximately 147,000,000 barrels in the state of which approximately 18,000,000 was in the Panhandle area. That while the Panhandle district had a potential of 140,000 barrels daily, a market for only about 40,000 barrels was available. That because of the withdrawal from that field in November, 1930, of some of the major purchasers of oil, some 220 leases were without any outlet for their oil, while others were being operated in varying degrees of production from a small percentage of their potential to the maximum of which they were capable. That appellant, because of refining its own oil, found it neither necessary to store oil nor to curtail its production. That this condition was directly attributable to a limited market demand for oil due to overproduction in the industry as a whole. That because of these facts unequal withdrawals resulted, causing underground waste; and excessive storage had accumulated causing aboveground waste and fire hazards. There was also ample evidence to show that restriction of production to prevailing market demand and prorating same over the field as a whole would directly tend to minimize such waste. Under such facts and circumstances we think the standard of curtailment used was reasonably calculated

to prevent the evil existing; and the fact that it may have incidentally or indirectly influenced the price of oil and tended to increase such price by reducing the supply available for the market is not sufficient to invalidate the order. Julian Oil & R. Co. v. Capshaw, 145 Okl. 237, 292 P. 841; Champlin Ref. Co. v. Corporation Commission of Oklahoma (D. C.) 51 F.(2d) 823; People v. Associated Oil Co., 211 Cal. 93, 294 P. 717. The Oklahoma statute expressly authorizes curtailment of production by a standard of market demand; and the California statute, as amended in 1931, impliedly does so. While the Acts of the 42d Legislature, 1st C. S., p. 46, ch. 26, § 1, amending in August, 1931, article 6014 of R. S. 1925 (Vernon's Ann. Civ. St. art. 6014) expressly prohibit the commission from curtailing production by a standard of "market demand," no such legislative inhibition obtained when these orders were issued. It may be observed also that the acts above mentioned indicate a complete reversal of legislative policy towards the powers vested in the commission. Whereas, the Legislature had theretofore clearly indicated an intention to vest in the commission a broad and discretionary power, both in ascertaining what constituted waste, in the determination of means of preventing it, and in the issuance of orders to accomplish that end; the latter act is one of definition and restriction, both as to what constitutes waste and of limitation of the authority vested in the commission to prevent it.

■ Nor do we sustain appellant's contention that the orders complained of violate the Fourteenth Amendment to the Federal Constitution. The operator's right to produce, and the amount which he may produce, is not, as contended by appellant, made to depend upon the uncontrolled consent and economic desire of the purchaser. It is definitely and specifically fixed by the maximum allowed by the commission for the district. It is not left to the producer to determine what the "market demand" is. If the duty were imposed upon the operator to ascertain the market demand, and to curtail his production accordingly, a different question would be presented. The amount of the market demand is but the quantity of oil that the purchasers and consumers normally absorb at the prevailing price, whatever that may be. The commission had the power and the information at its disposal with which to determine with reasonable certainty what that amount was. We are not seriously concerned with the detailed means by which that fact was ascertained. Suffice it to say that it was a matter capable of reasonably definite ascertainment. If the commission had authority to regulate production according to that standard, clearly it had the duty and authority to ascertain through proper methods which were available to it, as a fact-finding function, what that de-

mand was at any given time. Whatever, therefore, was indefinite in the power vested in the commission, was rendered definite, in the delegation to it of the authority to ascertain the facts. This view, we think, clearly distinguishes the instant case from that of State of Washington v. Roberge, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210, relied upon by appellant.

■ And so with the contention that the term "market demand" is too indefinite and uncertain to form any basis of regulation. If left to the determination of the producer or operator, and his guilt or innocence made dependent upon his ascertainment of that standard and his compliance with it, the cases cited, where the burden of that determination was placed upon the accused, might apply. See Cline v. Frink Dairy Co., 274 U. S. 445, 47 S. Ct. 681, 71 L. Ed. 1146; Int. Harvester Co. v. Kentucky, 234 U. S. 216, 34 S. Ct. 853, 58 L. Ed. 1284. But this rule does not apply where the determination of such definite standard is delegated to a qualified agency of the state with facilities available to it to ascertain the necessary facts by which to fix such standard. While the order was prospective in character, it was but for a period of less than 60 days, and was obviously based upon facts and conditions found to exist at the time it was issued; and was by its terms made subject to change even during that period as conditions might require. It was not, therefore, subject to such charge of indefiniteness bringing it within the authorities cited nor rendering it invalid for that reason.

■■ We next consider appellant's contention as relates to storage. It is true that the orders recite that one of the causes of physical waste was excessive storage in that district. Nor do the orders prohibit storage as such. If such storage were the only or primary cause of such waste, we doubt if the orders could be sustained. The statutes recognize, however, both underground waste and aboveground waste; and there was ample evidence of underground waste, independent of the matter of excessive storage, which the orders were designed to prevent. The statutes, as insisted by appellant, recognize the right to store oil under approved methods, and it is not necessary for us to decide whether excessive storage, under the statutes in force when the orders were issued, could have been prohibited. But we need not look to storage alone to test the validity of the orders, if physical waste in other respects and from other causes was taking place, and the orders were reasonably calculated to prevent it. If other grounds constituting physical waste existed, and were found by the commission to exist, upon which it could validly base a curtailment order, the mere fact that it may have found and recited one fact which it may not have been authorized to consider

is not sufficient ground to strike down the order. And if operators, such as appellant, though not storing oil, were in fact contributing to the creation of physical waste through excessive withdrawals from the reservoir, they are in no position to claim that storage does not constitute waste, if such waste were taking place regardless of storage.

 Appellant further contends that the orders are void and their enforcement against it as attempted should be enjoined, because the commission committed their administration to private and interested parties.

The order appoints an "umpire" for the district to have supervision of the enforcement, and who was to act with the advice and counsel of the "advisory committee" of eleven selected by the operators in the field. The umpire and his assistants were paid by the producers, not by the state. Much of the information furnished to the commission and to the umpire upon which he acted was furnished by the operators themselves. In brief, the commission relied to a large extent on the co-operation of the producers themselves for its information and the enforcement of its orders, because the Legislature had not made adequate provision therefor.

Whatever condemnation this may be subject to as a matter of public policy, we think it has little or no bearing upon the authority vested by law in the commission, or upon the validity of any orders it might issue within its jurisdiction. The fact that the Legislature has failed to make adequate provision for enforcement of a law is no test of its validity. The same would apply to an order of the commission. That matter relates rather to the effectiveness of its enforcement, and to the efficiency with which the commission can discharge its duties, than to its authority under the law. No complaint is made that the agents designated in the order failed to discharge their duties, were corrupt or partial in doing so, nor that the orders themselves were not properly and impartially enforced. Nor is any complaint made that the information furnished the commission by these enforcement agencies was incorrect or untrue. The manner and extent of the enforcement provided in the orders is not decisive of their validity unless it be such as in itself makes them arbitrary and unreasonable. No such case is here presented. Numerous instances could be cited, as was admirably done by the trial court, where the state has accepted the services of interested parties in making effective its laws. See Champlin Ref. Co. et al. v. Corporation Com. of Oklahoma, supra.

 Nor do we sustain the contention that such orders were a direct burden upon interstate commerce. The record does not disclose just what portion of the oil produced in that district moved in interstate commerce. But the order does not attempt to regulate in any

manner the disposition of the oil produced; nor make any discrimination or distinction as between that marketed intrastate and that to be shipped out of the state. The order concerned only the matter of waste as affected by the manner and extent of production, which has been held to be a local matter subject to state control. Jamieson v. Indiana Natural Gas & Oil Co., 128 Ind. 555, 28 N. E. 76, 12 L. R. A. 652; approved in Ohio Oil Co. v. Indiana, supra; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Julian v. Capshaw, 145 Okl. 237, 292 P. 841; People v. Associated Oil Co., 211 Cal. 93, 294 P. 717; Champlin Ref. Co. v. Corporation Com. of Oklahoma, supra. Where, however, it is the clear intent of such order or legislative act to affect interstate commerce, or the necessary result of same is to directly do so, it invades the field reserved to the Federal government. Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 556, 69 L. Ed. 963; West v. Kansas Natural Gas Co., 221 U. S. 229, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193. But as stated by Chief Justice Taft in the Coronado Coal Case: "The mere reduction in the supply of an article to be shipped in interstate commerce * * * is ordinarily an indirect and remote obstruction to that commerce."

The order here attacked was intended, and operated, to prevent waste, a matter clearly within the police power of the state; and whatever effect it may have had upon interstate shipments of oil, which was not made to appear, was indirect, incidental, and remote. The order relates only to the production of such resource—a process independent of, and completed before, the article enters the channel of interstate commerce.

 The case has been ably and exhaustively briefed by both sides. We have not undertaken to discuss nor differentiate the numerous arguments made and the numerous cases cited. Our conclusions have been reached, however, from a careful consideration of them. A very able consideration and discussion of many of the issues here presented is to be found in People v. Associated Oil Co. and Julian v. Capshaw, from California and Oklahoma, major oil producing states in which legislation and regulation in the light of modern conditions have kept pace with the progress of the oil and gas industry. It is also to be observed that most of the controverted issues herein raised in this case have been concluded by the legislative action of the 1st Called Session of the 42d Legislature subsequent to the trial of this case. The orders in question, however, are to be construed in the light of the laws as they existed prior to the change of legislative policy indicated in the acts passed in 1931; and, when so construed, we conclude that the orders attacked

were authorized and valid. The judgment of the trial court is therefore affirmed.

Affirmed.